EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* EVARISTO LUGO, acusado y apelante.

Núm. 12196.—*Sometido:* Marzo 25, 1948. *Resuelto:* Junio 25, 1948.

*Esteban Susoni Lens,* abogado del apelante; *Hon. Procurador General Luis Negrón Fernández* y *J. Rivera Barreras, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

42

El Juez Asociado Señor de Jesús emitió la opinión del tribunal.

El apelante fué acusado de·ataque para cometer violación, pero el jurado lo declaró culpable de acometimiento y agresión grave y fué sentenciado a noventa días de cárcel. El único error que señala en apoyo de su recurso es que el veredicto es contrario a la prueba. Precisa, pues, examinar la evidencia.

La testigo principal es, naturalmente, la supuesta ofendida. Declaró ésta que en o antes del 11 de junio de 1944 trabajaba como enfermera graduada en el Hospital de Distrito de Arecibo; que ese día una hermana suya salía, como a las dos y media de la tarde, para la ciudad de Nueva York; que quiso despedir a su hermana y a ese efecto salió de Arecibo para San Juan, como a las doce del día, en un automóvil público; que al llegar a Vega Alta abandonó el automóvil en que venía y tomó el del acusado porque el primero no marchaba a la velocidad que ella necesitaba para llegar al aeropuerto a tiempo; que al llegar a la entrada del aeropuerto le dijo al acusado que pensaba regresar en el tren, pero él le indicó que podía esperarla porque regresaría temprano para Arecibo, conviniéndose en que la recogiera a la salida del aeropuerto; que como a las tres de la tarde ella estaba esperándolo en el sitio indicado y abordó el automóvil; que se dirigieron a la parada quince en Santurce y allí otros pasajeros tomaron el automóvil y salieron seguido con rumbo a Arecibo; que los otros pasajeros se quedaron en el Campamento Buchannan y de allí siguió sola con el acusado hasta llegar a la primera luz de tránsito en la entrada de Bayamón, donde montó un pasajero y luego en Vega Alta subieron otros; que allí se detuvieron por más de diez minutos porque los pasajeros se bajaron a comprar algo y el acusado le trajo un emparedado y una lata de peras; que desde Vega .Alta hasta Arecibo estuvo siempre acompañada de pasajeros; que no se detuvieron en

Vega Baja ni en Manatí y que llegaron a Arecibo como a las siete de la noche,(¹) ya obscuro; que en Arecibo se bajaron los demás pasajeros continuando ella sola en el asiento delantero; que le pidió al acusado la llevara a la casa de enfermeras en el Hospital de Distrito; que él accedió y salieron para allá, pero ella observó que el acusado tomó la carretera de Camuy por lo cual le requirió que volviera atrás y la dejara en el Hospital, diciéndole él que iba a vi-

---

(¹) En su examen directo la supuesta ofendida no declaró que hubiera estado en el cine con el acusado. En el de repregunta, la defensa la interrogó insistentemente si había estado en algún sitio en San Juan antes de salir de la parada 15, y fué después de demostrarle que era inexplicable la tardanza do cuatro horas en llegar de San Juan a Arecibo y de preguntarle directamente si había estado en algún cine antes de salir para Arecibo, que lo admitió la supuesta ofendida, conforme aparece del siguiente pasaje de la transcripción de evidencia:

"P.—Después de ir al aeropuerto ¿no estuvo usted al cine? R.—Bueno, le voy a decir. Fuí al cine. P.—¿A qué cine? R.—Le voy a decir. P.—¿A qué cine fué? R.—Al cine que está allí. P.—¿Fué al Liberty? R.—No sé si fué al Liberty. P.—¿En qué sitio estaba? R.—Por donde cogen los carros para venir a Arecibo, en la quince. P.—¿En qué o cómo fué usted del aeropuerto al cine? R.—En carro. P.—¿En qué carro? R.—En el de él. P.—Si usted fué al cine en el carro de él, ¿cómo usted le dijo a la Corte y al Jurado que habían salido directamente del aeropuerto hacia Arecibo? Explique eso. R.—Bueno, yo le voy a decir al Jurado que ese no era un factor que fuera a perjudicarme por cuanto yo le dije a él que la película era una película buena y que yo tenía deseos de verla y que si me daba la oportunidad de verla y él me dijo que sí. P.—¿Por qué cuando le pregunté si había salido inmediatamente del aeropuerto no me dijo eso y me dijo que había salido en seguida? R.—Del aeropuerto salimos en seguida para Arecibo, pero al llegar allí, para darle tiempo para buscar pasajeros, entonces entré al cine y pagué. P.—¿Él entró? R.—Sí, señor, pero con la condición de que, cuando entrara, era a buscarme, no a ver la película. P.—¿Entró él al cine? S.—Sí, señor. P.—¿En qué momento? R.—Al poco rato de yo pagar la película y me senté aparte. P.—¿Y él dónde se sentó? R.—En el mismo asiento, pero retirado. P.—¿Vió la película con usted? R.—La vió. P.—Del cine, al salir del cine, ¿dónde fué usted? R.—Entonces salimos. P.—¿Salieron juntos? R.—Sí, señor. P.—¿A dónde fueron? R.—Regresamos para Arecibo. P.—¿En qué sitio estaba el carro, frente del cine? R.—Él lo parqueó al frente, un poco más abajo. P.—¿Fueron hacia el carro? R.—Sí, señor. P.—¿A qué hora salieron ustedes del cine? R.—No recuerdo. P.—¿Más o menos? R.—No recuerdo. P.—¿A qué hora entró usted al cine? R.—Cuando entramos la película ya . . . P. —Cuando dice, cuando entramos, ¿quiénes son? R.—Cuando entré yo. P.—¿Por qué dice, cuando entramos? R.—Una suposición. Cuando entré yo. A los quince o veinte minutos entró él. P.—¿Qué hora era? R.—No sé a la hora que empezó la película. En seguida terminó." (T. de E. págs. 17-19.)

rar más adelante y sin atender a sus requerimientos llegó hasta un cruce cerca del pueblo de Hatillo; que él paró allí y ella trató de bajarse pero él se lo impedía empeñado en tener contacto carnal con ella; que le preguntó su nombre y si era señorita(²) y ella rehusó darle esa información; que entonces pretendió cerciorarse de la verdad teniendo contacto carnal con ella, manifestándole ésta que antes tendría que casarse con ella pues era una señorita; que el acusado la besó varias veces y le tocó los muslos contra su voluntad; que logró ella salir del automóvil y él sacó una cuchilla y la amenazó con cortarle la cara si no accedía a sus deseos; que no la cortó a ella pero le cortó el vestido; que ella se mantuvo firme y él le pegó repetidas veces con los puños en el pecho y en la cara; que uno de los golpes "la dejó sin respiración" y cayó al suelo, pero ella se levantó y corrió y él le dió alcance y trató de recostarla de un árbol, pero ella se resistió; que en esos momentos pasaba una guagua de pasajeros y el chófer se detuvo y preguntó al acusado si pasaba algo, contestando éste que siguiera su marcha, que nada sucedía; que ella trató de dar un paso para coger la guagua y el acusado la detuvo; que el otro chófer siguió su marcha y ella no le dijo nada; que cayeron unas lloviznas y él le dijo que subiera al automóvil que no le haría nada; que ella subió y dejó la puerta abierta con el objeto de lanzarse a la carretera si él volvía a tratar de abusar de ella, pero le dijo que cerrara, que él no le haría nada y volvieron a Arecibo llevándola a la casa de enfermeras; que al llegar ella quiso pagarle y él se resistía a aceptar el pago y cuando ya él se retiraba, lo llamó y le dió un billete de $5 para que cobrase y él le dió la vuelta; que al llegar al Hospital, antes de las nueve de la noche, no habló con nadie ni enseñó el traje roto a la Superintendente; que al día siguiente, por la mañana, llamó al Presidente de

(²)En Puerto Rico la palabra "señorita" se usa en lenguaje corriente como sinónimo de "virgen".

la Unión de Chóferes de Arecibo núm. 37 y le contó lo que le había sucedido con el acusado; que aquella mañana temprano le pidió al Dr. José Sobrino, del mismo Hospital, que le hiciera un examen físico para que él certificase las contusiones; que ella le dijo que le hiciera el examen, pero para evitar una mala interpretación le sugirió que llamara al fiscal y se pusieran de acuerdo sobre el particular; que exteriormente no se veía ninguna contusión, pero que tenía lesiones internas producidas por los golpes.(³)

El *Dr. José Sobrino* declaró que a instancias del fiscal de distrito examinó a Aida Pagán el día 12 de junio, por la mañana, encontrando que estaba un poco nerviosa; y se quejaba de que se sentía adolorida en el hipocondrio derecho y en la región cervical derecha y no le encontró arañazo, golpe ni coloración o cardenal algunos.

La declaración de los testigos *Gumersindo García,* el chófer que la llevó el día 11 de junio desde Arecibo hasta Vega Alta y la de *Felipe García,* Presidente de la Unión de Chóferes núm. 37 de Arecibo, no arrojan luz alguna en el caso y no nos detendremos a reseñarlas.

La prueba de descargo consistió del testimonio del acusado. Este declaró que después que la supuesta ofendida tomó su automóvil a la salida del aeropuerto, se dirigieron a la parada quince con el fin de tomar pasajeros; que al llegar allí la perjudicada vió el anuncio de una película que exhibía el Teatro Liberty y quiso verla; que los dos fue-

---

(³)Repreguntada sobre los golpes declaró: "P.—¿Cuántos golpes le dió? R.—Bastantes. P.—¿Como veinticinco? R.—No, señor. P.—¿Como diez? R.— Me dió bastantes. P.—¿Le daba duro? R.—Exacto. Como hombre al fin. P. —¿Por dónde le daba? R.—Me dió por la espalda, al frente, en el abdomen. P.—¿En la cara? R.—Sí, señor. P.—¿Le daba con el puño cerrado? R.—Sí, señor. . . . P.—¿Este hombre, dándole a usted con el puño cerrado, como hombre a una mujer, no le hizo ningún cardenal? R.—Yo tomé árnica. P.— ¿Cuándo? R.—*Al otro día,* al sentirme los golpes, y puede ser que al tomarme el árnica se evitara la coloración. P.—¿Nunca tuvo magullamiento, cardenales? R.—Internamente puede ser. P.—¿Puede ser que los tuviera, pero no los vió usted ni el médico? R.—No, señor. P.—¿Externamente no los tuvo nunca? R.—No, señor." (Bastardillas nuestras.)

ron al cine pagando él las dos entradas; que le preguntó si era soltera o casada y ella le contestó que era divorciada y que su ex esposo estaba en las Fuerzas Armadas; que entonces él empezó a enamorarla; que salieron juntos del cine y se dirigieron a Arecibo con pasajeros; que en Vega Alta él la obsequió con un emparedado y una lata de peras; que después de llegar a Arecibo, como a las siete de la noche, ella le dijo que no tenía que regresar al Hospital hasta las nueve de la noche; que siguió con ella y paró frente al café Plaza y la invitó a tomar un jugo de peras y ella le contestó: "Todavía es temprano"; que siguieron con dirección a Hatillo y llegaron hasta Camuy; que en ningún momento le pidió que parara; que al llegar al cruce denominado Maracayo ella le dijo que regresara a Arecibo y allí viró; que recordando entonces que ella le había dicho que era divorciada empezó a enamorarla y ella le dijo que si él la enamoraba tenía que casarse con ella; que al decirle ella: "¿Se va a casar conmigo?" le contestó él que realmente no estaba seguro de que fuera señorita, casada o divorciada; que entonces ella le dijo que él se había equivocado con ella, contestándole él que entonces no era cierto lo que le había dicho ella en el Teatro Liberty al efecto de que era divorciada y en vista de esto la llevó al Hospital de Distrito.

A base de esta prueba el jurado trajo el veredicto que ya hemos indicado.

Habiendo el jurado dado crédito a la declaración de la supuesta ofendida, por lo menos en cuanto declaró que el acusado la había besado y tocado los muslos sin su consentimiento, el veredicto encuentra apoyo en la declaración de la supuesta ofendida, *Pueblo* v. *Díaz*, 62 D.P.R. 499, y no estamos por ese motivo justificados en intervenir con la discreción del jurado en la apreciación de la prueba.

Examinaremos ahora las instrucciones al jurado a fin de determinar si se cometió algún error fundamental que

en bien de la justicia demande la revocación de la sentencia. De ellas hemos seleccionado las siguientes:

1. "Ahora, este acusado dice que allí en la carretera no pasó nada. Que él sí trató de enamorarla. Habla de que ella le dijo que era casada, que era divorciada, pero que tenía su esposo en el Ejército. Después, a preguntas del abogado dijo que como era señorita él no le hizo nada.

2. "De manera que el acusado se ha sentado ahí y ha tenido la oportunidad de decir cualquier hecho que hubiese ocurrido entre ellos dos de relaciones íntimas, pero el acusado no ha traído nada. Lo que ha hecho es negar. Lo que ha hecho es negar lo que dice ella, pero negar sin decir que ella lo incitara a nada, sin decir que ella realmente lo buscara a él para nada, sino que lo invitó a dar un paseo porque tenía su noche libre.

3. "Él no puede ahora dejar ante el Jurado la sospecha de la reputación de ella porque no ha sostenido bajo juramento ningún acto que sea contrario a esa reputación. Ustedes no pueden actuar por insinuaciones. No pueden actuar por palabritas. No pueden actuar por cosas supuestas que él haya tenido la oportunidad de decir y que no quiso decir o que no puede decir. Porque el Jurado tiene que atenerse únicamente a la evidencia que aquí se haya presentado.

4. "Señores del Jurado, los carros públicos son porteadores de pasajeros que tienen una licencia y que están sujetos a reglamentos que imponen a los chauffeurs el más completo orden, porque los carros públicos, como el tren o como cualquier otro vehículo donde transitan señoras, niños y caballeros, deben tener la confianza del público, y a nadie más que a los chauffeurs, a la Asociación de Chauffeurs, les conviene que exista esa confianza porque el día que se pierda esa confianza los chauffeurs se morirán de hambre y tendrán que hacer otro trabajo.

5. "En Puerto Rico la mujer hoy tiene mucha libertad, pero es porque la ley la protege. Una mujer sale, como salió esa señora o señorita para San Juan, en la confianza de que aquí hay leyes, en Puerto Rico, que hacen respetar el honor de la mujer. Por eso salen solas. Por eso, cuando ustedes, por ejemplo, dejan ir a su esposa o hija en uno de esos carros públicos, están confiando en la integridad de estos chauffeurs. Están confiando en que el gobierno le da licencias a estos chauffeurs para que sean respetuosos. Es más, tienen el deber de ser respetuosos aun cuando la mujer sea libre.

Porque el deber de ellos en ese momento es el deber de llevar al pasajero sin intervenir en sus relaciones. No es el hombre que tiene un carro y coge una mujer y lleva a esa mujer allá y la enamora porque tiene ese carro y porque es amigo de ella. Ellos no, ellos son porteadores públicos que están en la obligación de cumplir y respetar a todo pasajero, aunque sea una prostituta. Estas cosas el Juez tiene que decirlas porque están ocurriendo muchos sucesos en Puerto Rico *que hay que refrenar.*

6. "Señores del Jurado, al decir esto que he dicho ahora, no estoy dando opinión en este caso. El Juez no puede dar opinión en este caso. *Lo he dicho para que ustedes sepan la responsabilidad que tienen al juzgar este caso,* si en realidad encuentran al acusado culpable, fuera de duda razonable." (T. de Autos, págs. 51–53.) (Bastardillas nuestras.)

El Lic. A. Reyes Delgado, quien representó al acusado en el acto del juicio,([4]) oportunamente tomó excepción a estas instrucciones y llamó la atención al juez específicamente de los errores en las mismas.

Las instrucciones marcadas 1, 2 y 3 tendieron a desacreditar la declaración del acusado. Éste en su testimonio no se limitó, como erróneamente dijo la corte, a negar lo que contra él había declarado la supuesta ofendida. El resumen que hemos hecho de su declaración revela que el acusado explicó todo lo que, según él, sucedió entre ellos el día de autos, desde que ella abordó su automóvil en Vega Alta en su viaje hacia San Juan hasta que, como a las nueve de la noche, la dejó en la casa de las enfermeras en el Hospital de Distrito de Arecibo, donde ella residía. Se trataba de dos versiones distintas de los hechos e incumbía al jurado pesarlas y considerarlas libre de prejuicios para determinar cuál era la verdadera. Decir el juez al jurado que el acusado había ocupado la silla testifical y "no ha traído nada", decirles que el jurado no puede actuar por insinuaciones, por "palabritas", "por cosas supuestas que él [el acusado] haya tenido la oportunidad de decir y que no quiso decir o que no puede decir", equivalía a instruir al jurado que no diese

---

([4]) El abogado Reyes Delgado no lo representó en este recurso.

crédito a la declaración del acusado. Y continúa perjudicándose al acusado al decirle al jurado en la tercera instrucción que el acusado ahora no podía dejar ante el jurado la sospecha de la reputación de ella "porque no ha sostenido bajo juramento ningún acto que sea contrario a esa reputación". Olvidó el juez que la reputación de la supuesta ofendida no estaba en controversia y que tal instrucción, además de distraer la mente del jurado de la verdadera cuestión a considerar, constituía una insinuación, seguramente inconsciente, para que dejase en pie la reputación de la ofendida trayendo un veredicto contra el acusado.

Las instrucciones marcadas 4, 5 y 6 relacionadas con los deberes de los chóferes de automóviles públicos para con sus pasajeros, fueron claramente perjudiciales a los derechos del acusado. La cuestión a determinar el jurado no era si el acusado había faltado a sus deberes como porteador público. Él pudo haber incurrido en conducta grosera y desconsiderada para con la pasajera y sin embargo, no ser culpable del delito por el cual se le estaba juzgando. Y sube de punto el daño a los derechos del acusado al decirles en la última oración de la instrucción 5ta.: "Estas cosas el Juez tiene que decirlas porque están ocurriendo muchos sucesos en Puerto Rico *que hay que refrenar.*" Y enfatiza este punto en la 6ta. instrucción al decirles: "Lo he dicho para que *ustedes sepan la responsabilidad que tienen al juzgar este caso . . .*" Es verdad que estas últimas palabras van seguidas de la frase: "si en realidad encuentran al acusado culpable, fuera de duda razonable." Pero estas últimas palabras no podían subsanar el daño ya consumado. A virtud de estas instrucciones, el jurado debió sentirse moralmente obligado a traer un veredicto contra el acusado. De ese modo descargaba su responsabilidad contribuyendo así a refrenar el supuesto mal a que tan enfáticamente se refirió el juez. (Bastardillas nuestras.)

El análisis que de las instrucciones acabamos de hacer, nos lleva a concluir que el acusado fué privado del juicio justo e imparcial a que tenía derecho. De intento nos hemos abstenido de comentar la prueba. Solamente la hemos expuesto a fin de que ella hable por sí, pues considerando que en el presente caso se impone la revocación de la sentencia y la concesión de un nuevo juicio, no debemos en forma alguna prejuzgar su resultado.

*Procede la revocación de la sentencia y devolver el caso a la corte inferior para la celebración de un nuevo juicio.*