En el Tribunal Supremo de Puerto Rico

| El Pueblo de Puerto Rico<br>      Recurrido<br><br>            V.<br><br>Oscar Soto González<br>      Peticionario | Certiorari<br><br>99 TSPR 116 |
| --- | --- |

Número del Caso: CC-1996-0057

Abogado de la Parte Peticionaria:  Lcdo. Elpidio Batista

Abogados de la Parte Recurrida:    Hon. Carlos Lugo Fiol,
                                   Procurador General Auxiliar
                                   Lcda. Eunice Amaro Garay
                                   Procuradora General Auxiliar

Tribunal de Primera Instancia, Subsección de Distrito, Sala de Bayamón

Juez del Tribunal de Primera Instancia: Hon. Kalil Baco Viera

Tribunal de Circuito de Apelaciones: Circuito Regional II Bayamón

Juez Ponente: Hon. Ortíz Carrión

Fecha: 7/7/1999

Materia: Art. 95 C.P.

Este documento constituye un documento oficial del Tribunal
Supremo que está sujeto a los cambios y correciones del
proceso de compilación y publicación oficial de las
decisiones del Tribunal. Su distribución electrónica se hace
como un servicio público a la comunidad.

**El Pueblo de Puerto Rico**

    **Recurrido**

        **v.**                  **CC-96-57**        **CERTIORARI**

Oscar Soto González

        **Acusado-peticionario**


SENTENCIA

**San Juan, Puerto Rico, 7 de julio de 1999**

El peticionario Oscar Soto González, cuestiona ante nos la validez de un fallo condenatorio por el delito de agresión agravada, Artículo 95 del Código Penal, 33 L.P.R.A. sec. 4032, emitido por el extinto Tribunal de Distrito, Sala de Bayamón. Al peticionario, Dr. Soto González, se le impuso una pena de quinientos dólares. Básicamente, como suele suceder en éstos casos, el Dr. Soto González ataca la suficiencia de la prueba y, de paso, alega que ésta no demostró su culpabilidad más allá de duda razonable.

Por la naturaleza de las controversias planteadas, procede que hagamos un recuento detallado de la prueba desfilada a nivel de

instancia, conforme **la exposición narrativa de la prueba que fuera estipulada por las partes. Veamos.**

I

**La menor R.J.N.P., al momento de los hechos, era una niña de cinco años de edad que cursaba estudios en la American School. Dicha institución refirió a la menor al acusado-peticionario para una evaluación psicológica.**

> **El 7 de septiembre de 1993, la Sra. Carmen J. Pomales Morales acudió con su hija, R.J.N.P., a la cita concertada en la oficina del Dr. Soto** González**. Llegó al consultorio, aproximadamente, a la 1:00 p.m. Después de entrevistar a la Sra. Pomales por unos quince minutos, el Dr. Soto** González **fue a otra sala con la niña para realizar la evaluación;** la entrevista con la niña duró aproximadamente cuarenta y cinco (45) minutos. **Concluida ésta, el peticionario y la niña salieron a la sala de espera donde e**speraba **la madre de** la niña. **Luego de una** breve **conversación, la Sra. Pomales pagó el importe de la consulta y la menor se despidió del Dr. Soto** González **con un beso en la mejilla.** Madre e hija se marcharon.

**Al salir de la oficina, la Sra. Pomales y su hija se toparon con la Sra. Aida Meléndez, quien acudía a la oficina del Dr. Soto con su hijo para una consulta. La Sra. Meléndez observó a la niña y a su señora madre a una distancia aproximada de un pie o pie y medio por un periodo de 30 segundos a un minuto. Según el testimonio, <u>no refutado</u>, de la Sra. Meléndez, la niña no tenía nada en su rostro[1], no lloraba, ni se quejaba. Ésta concluyó expresando que no observó nada fuera de lo normal en la cara de la perjudicada.**

**En el ascensor, la Sra. Pomales preguntó a su hija si había sido "chévere" y si había "jugado" en la entrevista. Según el testimonio de la Sra. Pomales, la menor tenía toda el área alrededor de la boca con "puntitos rojos". En el vestíbulo del edificio, donde ubican las oficinas del Dr. Soto González, la Sra. Pomales inquirió sobre los "puntitos rojos" a su hija. La menor, luego de pedir a su madre que se movieran a una esquina, expresó que el doctor la había besado. La Sra. Pomales decidió regresar a la oficina del Dr. Soto González; habían**

---

[1] **A tales efectos, por ejemplo, la Sra. Meléndez recordó el color de los ojos de la menor.**

transcurrido aproximadamente quince minutos desde que ésta salió del consultorio hasta que volvió al mismo a raíz del relato de su hija.

Al llegar a la oficina, La Sra. Pomales observó varias personas en la sala de espera, llamó a la puerta y el Dr. Soto González abrió la misma. La Sra. Pomales preguntó al peticionario si algo le había pasado a su hija en el área de la boca. El Dr. Soto González, alegadamente, se puso nervioso y preguntó a la menor si se había dado con una mesa, o algo, ya que su madre estaba muy preocupada. Luego de repetir esto, supuestamente, sacó una "peseta" de su bolsillo y se la dio a la menor, mientras expresó "mira como está tu mamá". La Sra. Pomales no objetó ni increpó al Dr. Soto González. Tampoco le dijo "fresco" ni hizo imputación o expresión alguna sobre el aludido beso. La Sra. Pomales manifestó que, no empece a su indignación por lo sucedido, no le dijo al Dr. Soto González lo que su hija había manifestado pues trató de "mantener la cordura". Así las cosas, la Sra. Pomales acudió a la oficina del pediatra de la menor, el Dr. Elías Bou Gautier. Allí la Sra. Pomales expresó al pediatra que otro doctor había besado a su hija en la boca. La menor confirmó la imputación.

El Dr. Bou, quien era el pediatra de la niña desde hacía dos años[2], expresó que, al llegar la Sra. Pomales a su oficina, ésta insistió en el hecho de que el Dr. Soto González había permanecido sólo con la niña por unos cuarenta y cinco minutos y no la había invitado a ella a estar presente. Indicó que la madre le expresó que, al salir de la oficina del Dr. Soto González, había notado unos "puntitos rojos" en el área de la boca de su hija y que, al preguntarle al doctor [Soto] al respecto,

---

[2] El Dr. Bou Gautier tiene licencia como médico. Si bien es cierto que no ha tomado los exámenes nacionales (Boards) en el área de pediatría, según indicó, se le reconoce como pediatra al haber concluído su residencia. Desde 1988 practica la medicina privadamente y tiene unos 2,300 expedientes de pacientes. Este fue su primer caso en un tribunal.

En cuanto a la perjudicada, indicó que ésta goza de un buen estado de salud y que sólo padece de asma. En el contrainterrogatorio, admitió que la menor ha padecido de convulsiones, sinusitis, infecciones de garganta, vómitos, diarreas, y gastroenteritis aguda. Además, tiene indicados medicamentos antiepilépticos permanentes preventivos. El aspecto de la epilepsia fue admitido también por la Sra. Pomales.

éste le dijo a la niña "dile a tu mamá que te diste en la boca con una mesa"[3].

Ante este cuadro, el Dr. Bou procedió a examinar a la perjudicada y encontró "petequias en los tejidos alrededor de la boca. Incluyendo la parte exterior de los labios (inferior y superior); la parte de adentro de los labios, más prominentemente en el labio inferior". Según el examen efectuado a la niña por el Dr. Bou, éste no encontró lesiones similares en el resto del cuerpo; tampoco ningún tipo de lesión en el área genital, vulva, ni ano. Además, no hubo historial ni evidencia de caricias, ni que se hubiera tocado a la niña en sus genitales, senos, etc. Finalmente, al hablar con la menor, ésta le indicó al Dr. Bou que un doctor la había besado. El Dr. Bou concluyó en ese momento que las petequias de la menor fueron producto de succión o presión negativa. Aunque reconoció que las causas de las petequias son muchas y variadas, descartó que, en el caso de su paciente, éstas fueran producto de un desorden de coagulación pues la menor no tenía problemas de plaquetas. Para llegar a su conclusión, el Dr. Bou consideró las manifestaciones tanto de la Sra. Pomales como de su hija, junto al examen y pruebas efectuadas.

Debe señalarse, por otro lado, que durante el contrainterrogatorio, el Dr. Bou admitió que, lo primero que anotó en el récord, como "chief complaint" de la Sra. Pomales, fue que ésta insistió en el hecho de que el Dr. Soto González había permanecido sólo con la niña por unos cuarenta y cinco minutos y no la invitó a ella a estar presente. El Dr. Bou consideró que, desde el punto de vista pediátrico, "le estuvo raro que un doctor se quede sólo con una niña por cuarenta y cinco minutos". Aparte de esto, el pediatra consignó en el récord que la Sra. Pomales le expresó que, supuestamente el Dr. Soto González le había dicho a la niña: "dile a tu mamá que te diste con una mesa". Luego de esto, el Dr. Bou llamó a la policía.

---

[3] Dicho comentario fue negado rotundamente por la Sra. Pomales.

Respondiendo al llamado del Dr. Bou, acudió el policía Moisés Carmona Velázquez. Éste se personó a investigar luego de que el centro de mando informara que "había una niña que había sido violada". El policía entrevistó a la Sra. Pomales y al Dr. Bou. Ambos relataron los hechos antes expuestos, haciendo hincapié en lo "prolongado" de la entrevista entre el Dr. Soto y la niña. Eventualmente, luego de "consultar" con un fiscal, sometió el caso ante la consideración de un juez, quien determinó ausencia de causa probable para arrestar. Es preciso reseñar que la niña perjudicada no expresó, en la primera vista ante el aludido juez, que el Dr. Soto González la había besado.

Posteriormente, el caso se sometió ante otro juez, quien encontró causa probable. A este segundo juez, la niña indicó que el beso recibido de parte del Dr. Soto González fue "como el de papá y mamá". Llegado el día del juicio en su fondo, además del testimonio aquí reseñado, la niña manifestó que su mamá le había dicho que le dijera al juez que el beso no había sido como el de papá y mamá. Asimismo, la perjudicada dijo que su mamá le indicó que dijera que el doctor le había apretado la boca. Terminada la prueba de cargo, la defensa presentó prueba. Ésta consistió en el testimonio de un perito, el Dr. Pedro R. Jaunarena Pérez[4], la Sra. Aida Meléndez Meléndez ––la persona que se había encontrado con la perjudicada y su señora madre a la salida de la oficina del Dr. Soto–– y varios testigos de reputación.[5]

---

[4] Entre sus credenciales, se destacan las siguientes: Doctor en medicina especializado en pediatría. Graduado de la Escuela de Medicina de la U.P.R. en el 1961. Hizo su internado en el Albert Einstein Medical Center en Philadelphia. En el año 1964, hizo su internado en pediatría en el Hospital Universitario. Luego, aprobó los "national boards" tanto generales como en pediatría. Además, ha ejercido como pediatra por más de treinta años; fue profesor en la Escuela de Medicina de la U.P.R. por casi veinte años; ha presidido la sección de pediatría de la Asociación Médica de P.R. y presidió también el Capítulo de P.R. de la Academia Americana de Pediatría. Por último, debe resaltarse el hecho de que es director y vicepresidente del Albergue Hogar Niñito Jesús para niños maltratados y abusados.

[5] Estos fueron: el Lcdo. Hugo Rodríguez (presidente de la Junta de Condómines del edificio donde ubican las oficinas del peticionario); Sr. Israel Irizarry (director de escuela quien refiere casos al Dr. Soto desde hace doce años); Dr. Manuel Olmo (sacerdote episcopal y psicólogo clínico de profesión, además de testificar en torno a la

Considerada la prueba, el Tribunal de Primera Instancia, Subsección de Distrito, Sala de Bayamón, encontró al peticionario culpable del delito de agresión agravada e impuso al Dr. Soto González una pena de quinientos dólares. Inconforme, el Dr. Soto González acudió al Tribunal de Circuito de Apelaciones. Dicho foro apelativo intermedio, en una extensa sentencia, confirmó el dictamen recurrido. De dicha sentencia es que comparece el peticionario ante nos vía *certiorari*. Plantea que erró el tribunal al evaluar y apreciar la prueba puesto que ésta no demostró su culpabilidad más allá de duda razonable.

Expedimos el auto solicitado. Eventualmente, el peticionario presentó su alegato. Por su parte, el Procurador General hizo lo propio. Escudriñados los argumentos de las partes, los autos originales, incluyendo la exposición narrativa de la prueba, las fotografías admitidas como prueba sustantiva y el derecho aplicable, nos encontramos en posición de resolver. Revocamos.

II

Previo a entrar a considerar los méritos del recurso, es preciso hacer una breve reseña de la trillada norma que rige la evaluación de la prueba, por parte de un foro apelativo, presentada a nivel de instancia.

En <u>Pueblo</u> v. <u>Maisonave</u>, 129 D.P.R. 49 (1991), este Tribunal expuso, en síntesis, la doctrina que rige cuando de revisar fallos de culpabilidad se trata. Allí expresamos que las determinaciones de hecho del tribunal de primera instancia no deben ser rechazadas de forma arbitraria, ni sustituidas por el criterio del foro apelativo, salvo que éstas carezcan de fundamento suficiente a la luz de la prueba presentada. Ciertamente, los foros de instancia están en mejor posición para evaluar la prueba desfilada, pues tienen la oportunidad de observar y escuchar a los testigos y, por tal razón, su apreciación merece gran respeto y deferencia.[6] En fin, a menos que exista pasión, prejuicio, parcialidad y error manifiesto, y/o que la apreciación de la prueba se distancie de la realidad fáctica o ésta sea inherentemente imposible o increíble, el tribunal apelativo debe abstenerse de intervenir con la apreciación de la evidencia hecha por el tribunal de primera instancia.[7]

---

buena reputación del Dr. Soto, atestiguó que, en la práctica, la entrevista para ofrecer las pruebas en casos como el de la perjudicada se realiza sin que esté presente ninguna otra persona y dura aproximadamente cuarenta y cinco minutos); Dr. Pedro Rivera (economista y profesor universitario—compañero de facultad del peticionario); el Sr. Luis Ocasio Monroig (contralor de la Cooperativa de Seguros Multiples y vecino del peticionario); Osvaldo Delbrey (ministro ordenado y ex vecino del peticionario); Lesbia Torres Jiménez (los maestros del Colegio Lasalle recomendaron al Dr. Soto y, desde entonces su hijo es el paciente del peticionario); Jorge Martínez Rivera (compañero de facultad del peticionario); y por último, testificaron la esposa y uno de los hijos del Dr. Soto.

[6] <u>Pueblo</u> v. <u>Cabán Torres</u>, 117 D.P.R. 645 (1986); <u>Pueblo</u> v. <u>Ríos Álvarez</u>, 112 D.P.R. 92 (1982).

Por supuesto, lo anterior no significa que el foro recurrido sea inmune al error; mucho menos, so color de la deferencia y el carácter recurrente del tipo de planteamientos que hoy enfrentamos, nos haremos de la vista larga ante los errores de dicho foro.[8] Aunque no ocurre con mucha frecuencia, hemos revocado sentencias en las cuales las determinaciones de hecho, aunque sostenidas por la prueba desfilada, no establecen la culpabilidad del acusado más allá de duda razonable.[9]

Dado los hechos particulares del caso ante nos, sobre todo el énfasis en la prueba pericial, debemos reseñar el trato que los foros apelativos brindan a este tipo de testimonio. Conocido es que, como foro apelativo, no estamos obligados "a seguir indefectiblemente la opinión, juicio, conclusión o determinación de un perito o facultativo ... y que todo tribunal está en plena libertad de adoptar su criterio propio en la apreciación y evaluación de la prueba pericial y hasta descartar la misma aunque resulte ser técnicamente correcta".[10]

Expuestos estos principios básicos de práctica apelativa, procede entrar a considerar los méritos del recurso ante nos.

### III

Comete el delito de agresión aquella persona que emplea fuerza o violencia contra otra para causarle daño. El Artículo 95 del Código Penal[11] dispone que la agresión será agravada cuando, entre otras circunstancias, se cometa por un varón adulto en la persona de una mujer o niño. Nadie debe albergar la más mínima duda sobre el hecho de que constituye, o comete el, delito de agresión un hombre que besa a una mujer, sin el consentimiento de esta última. Cf. Pueblo v. Díaz, 62 D.P.R. 499, 504 (1943); Pueblo v. Lugo, 69 D.P.R. 41 (1948).

Ahora bien, tras un examen de los hechos antes descritos, salta a la vista que la médula del asunto a ser dilucidado en el presente caso es el *supuesto* beso que provocó las petequias. En esa misma línea, resulta neurálgico el testimonio pericial brindado por los dos facultativos médicos en el presente caso.

Las petequias son descritas como pequeñas erupciones cutáneas puntiformes, debidas a un pequeño derrame sanguíneo superficial. Las petequias son inicialmente de color rojo violáceo o rojo pardusco, y van cambiando poco

---

[7] **Pueblo v. Rivero, Lugo y Almodóvar**, 121 D.P.R. 454 (1988); **Pueblo v. De Jesús Rivera**, 113 D.P.R. 817, 826 (1983); **Pueblo v. Turner Goodman**, 110 D.P.R. 734, 738 (1980); **Pueblo v. Luciano Arroyo**, 83 D.P.R. 573, 581–582 (1961).

[8] **Pueblo v. Pagán Díaz**, 111 D.P.R. 608, 621 (1982).

[9] **Pueblo v. Meléndez Rolón**, 100 D.P.R. 734 (1972); **Pueblo v. Rivera Arroyo**, 100 D.P.R. 46 (1971); **Pueblo v. Díaz Just**, 97 D.P.R. 59 (1969); **Pueblo v. Toro Rosas**, 89 D.P.R. 169 (1963).

[10] **Culebra Enterprises Corp. v. E.L.A.**, res. el 31 de octubre de 1997, 143 D.P.R. __ (1997); **Díaz García v. Aponte Aponte**, 125 D.P.R. 1, 13 (1989); **Prieto v. Maryland Casualty Co.**, 98 D.P.R. 594, 623 (1970).

[11] **33 L.P.R.A. sec. 4032.**

a poco hacia el verdoso, el amarillento, el pardusco, por sucesivos cambios químicos de la hemoglobina de la sangre derramada. Las petequias pueden deberse a causas diversas: externas (parasitarias: picaduras de insectos, mordeduras de serpientes, etc.; mecánicas, pinchazo de alfiler, etc.) e internas (por enfermedades infecciosas: septicemia, tifus exantemático, viruela, etc.; por enfermedades de la sangre: púrpura de Werihof, anemia perniciosa, leucemia, etc.; por graves enfermedades del hígado; por carencias vitamínicas tales como el escorbuto; por intoxicaciones diversas).[12] La petequia se distingue ya que, al aplicar presión con el dedo, no desaparece.

Los dos médicos que testificaron en el juicio aceptaron que las petequias pueden surgir por infinidad de motivos. En cuanto a dicho aspecto, no hay controversia. Asimismo, no está en disputa que las petequias halladas en la menor podían haber sido producto de succión; ésta es una de las posibles causas para la condición. Sin embargo, la realidad es que, en una de las áreas cruciales, el Dr. Bou --pediatra de la niña-- no refutó el testimonio pericial del Dr. Jaunarena. Nos referimos, en esencia, al aspecto del dolor que debió haber sentido la niña perjudicada de haber sido cierto que las petequias en su boca fuesen producto de tal succión (un beso) que rompió los capilares.

De la exposición narrativa de la prueba, estipulada por las partes, se desprende que la perjudicada no se quejó ni lloró cuando, alegadamente, el Dr. Soto González la besó. El perito de la defensa, Dr. Jaunarena Pérez, testificó que era imposible que las petequias sufridas por la niña fueran producto de un beso o chupón sin que ésta hubiese sentido dolor e incomodidad de tal magnitud que, con toda probabilidad, la hicieran llorar o gritar. Añadió además, el Dr. Jaunarena, que, dado que la menor presentaba petequias, tanto en la parte exterior como interior de sus labios, era necesario que el Dr. Soto González hubiera agarrado el labio inferior, lo torciera y entonces chupara con tal fuerza que rompiera los capilares para producir las petequias en la parte interior del labio. Por supuesto, según su testimonio, tal acción también produciría dolor. Si bien es cierto que el ministerio público intentó establecer que hay distintos grados de tolerancia al dolor, dicho argumento se cae por su propio peso si consideramos que la perjudicada es una menor de apenas unos cinco años. Además, es obvio que estaríamos entonces, cuando menos, ante dos chupones o besos, no uno como

---

[12] **Enciclopedia de conocimientos básicos, Salvat Medicina**, Tomo IX, Ediciones Pamplona, 1974. "Petechia [is] a pinpoint, nonraised, perfectly round, purplish red spot caused by intradermal or submucous hemorrhage", The Sloane-Dorland Annotated Medical-Legal Dictionary, 1992 Supp., West Publishing, New York, pág. 405. En términos análogos también ha sido descrita como: "a small purplish spot on a body surface, such as the skin or a mucous membrane, caused by a minute hemorrhage and often seen in thypus. The American Heritage Stedman's Medical Dictionary, Houghton Mifflin Company, Boston, 1995, pág. 627.

testificó la menor.[13] Ambos, según el testimonio pericial no controvertido, producirían un dolor de tal magnitud que harían a la perjudicada llorar y/o gritar.

¿Podía el ilustrado foro sentenciador descartar dicho testimonio? ¿Con qué prueba lo iba a sustituir? ¿Con su propio criterio? No hay duda de que, en nuestra jurisdicción, los tribunales pueden sustituir el testimonio pericial con su propio criterio. Sin embargo, debe evaluarse la tangencia que ello tiene sobre la responsabilidad del Estado de probar la culpabilidad de un acusado más allá de duda razonable.

El foro apelativo incidió al conceder una valía desmedida al hecho de que el Dr. Bou era un "perito de ocurrencia". Llegó, al así proceder, a calificar dicho testimonio de irremplazable. Esto, por supuesto, citando jurisprudencia nuestra a esos efectos. Huelga mencionar que el mero hecho de que un perito sea uno de ocurrencia no le garantiza el adjetivo calificativo de irremplazable. Veamos por qué.

Normalmente, lo que otorga al testimonio del perito de ocurrencia incalculable valor es el hecho de que percibió de forma inmediata los hechos. ¿Tiene ese evento alguna importancia particular en el caso ante nos? No. Ambos peritos están contestes en que las petequias son producto de múltiples y variadas causas. ¿Qué importancia tiene el que el Dr. Bou las observó primero? Aquí no hay problema de diagnóstico equivocado; los puntitos rojos en la boca de la niña son petequias. ¿Estaba el Dr. Bou en mejor posición para determinar las causas de estas por ser perito de ocurrencia? Es preciso recordar aquí que, según su testimonio, varios elementos coincidieron cuando el Dr. Bou entendió que estaba ante la presencia de "contacto sexual". Por ejemplo, le pareció "raro" que un doctor estuviera a solas con una niña por cuarenta y cinco minutos. Añádasele a esto que, supuestamente, el Dr. Soto González le había dicho a la niña "dile a tu mamá que te diste con una mesa". <u>Nótese que ambos hechos resultaron ser incorrectos</u>. Veamos.

En primer lugar, y en cuanto al período transcurrido, la prueba <u>no</u> controvertida refleja que, de ordinario, el tipo de examen psicológico al que se sometió la menor dura unos 40 a 45 minutos. En segundo término, la alegada manifestación hecha por el Dr. Soto González fue a los efectos de que éste se limitó a inquirir si la menor se había dado, o no, con una mesa o algún otro objeto. Naturalmente, ambos factores tienen que haber afectado la óptica mediante la cual el perito de ocurrencia concluyó que la lesión en la boca fue producto de un beso. Nótese que no estamos devaluando su testimonio pericial; simplemente expresamos que su testimonio de perito de ocurrencia no acarrea el adjetivo calificativo de irremplazable por cuanto el mismo se basa en dos hechos o premisas incorrectos.

---

[13] **Por otro lado, de adoptar la teoría de un solo chupón, o beso, de forma simultánea, tiene que haberse producido un golpe que provocaría las petequias en el labio interior.**

Es sabido que la calificación para declarar como perito descansa en la posesión de "especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente" en el área sobre el cual se habrá de testificar. Regla 53 de Evidencia, 32 L.P.R.A. Ap. IV R. 53. De otro lado, la posesión de tal cualificación por el testigo puede probarse por cualquier evidencia admisible, "incluyendo su propio testimonio". Claro, en los juicios, no prevalece la parte que más peritos presente al tribunal, esto no sólo porque, de ordinario, las partes no cuentan con igualdad de recursos, sino porque la función del perito es auxiliar al tribunal, y, para ello, muchas veces, no hace falta una manada de éstos. Sin embargo, no puede taparse el cielo con la mano; como en casi todas las áreas, "hay peritos y hay peritos".

Entre los elementos para evaluar el testimonio pericial se destacan la educación, experiencia, preparación, reputación y consideración de sus pares y, sobre todo, la lealtad para con la búsqueda de la verdad. El hecho de que la parte que más peritos lleve al tribunal no necesariamente prevalezca, no implica que el auxilio que éstos brinden al tribunal sea igual.

Hoy día, lamentablemente, es común en el escenario judicial la proliferación de "peritos" con grandes bagajes de conocimiento, preparación y experiencia que ofrecen explicaciones periciales mutuamente excluyentes. Humanamente, no logramos arribar a una explicación racional, mucho menos ética, de éste tipo de panorama. Sin embargo, ese no es el caso ante nos. El testimonio de ambos peritos, si es analizado con detenimiento, puede coexistir el uno con el otro. No es éste el típico caso donde acusado y acusador ofrecen versiones disímiles. Tal y como expresáramos antes, la prueba de cargo no superó las dudas creadas por la prueba de defensa.

Existe base suficiente en el expediente para colegir que, en el presente caso, hay duda razonable sobre la culpabilidad del acusado. Ello debido, de manera principal, a dos razones. En primer lugar, no podemos ignorar la evidente influencia, o manipulación, que ejerció la madre de la niña sobre el testimonio de ésta; curiosamente ello se conoce a través del propio testimonio de la menor. En segundo término, la naturaleza pericial del testimonio brindado por el perito de defensa. Su *expertise* en el campo, sus años de experiencia, su certificación como especialista y su rol en la comunidad en casos de niños maltratados brindan base suficiente para que, junto al hecho antes mencionado, a la prueba de buena reputación, y el testimonio de otra persona ajena al proceso --quien indicó que no observó nada en el rostro de la menor al salir de la oficina-- se materialice la mística figura de duda razonable.

Si se escudriña el asunto, tenemos que concluir que el concepto de duda razonable tiene una similitud con el amor: es un tanto difícil de definir y describir pero podemos reconocerlo cuando está frente a nosotros. Aceptamos que el caso de autos presenta una situación antipática. La posibilidad de que la menor haya sido objeto de este tipo de grotesca agresión incide en

nuestra sensibilidad. Sin embargo, aun ante el cuadro repulsivo que representa dicha posibilidad, tenemos que, de forma sensata y humilde, reconocer que percibimos duda razonable en este caso. La duda razonable se concretiza en nuestra mente cuando, llegado el día de decidir la culpabilidad del acusado, nos encontramos vacilantes, indecisos, ambivalentes o insatisfechos en torno a la determinación final. Así nos encontramos hoy.

IV

**A tenor con todo lo antes expuesto, procede <u>revocar</u> la sentencia emitida por el Tribunal de Circuito de Apelaciones, decretándose la absolución del acusado peticionario en el caso de autos por no haberse probado su culpabilidad más allá de duda razonable.**

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Negrón García emitió opinión disidente, a la cual se une la Juez Asociada señora Naveira de Rodón. El Juez Presidente señor Andréu García no intervino.


Isabel Llompart Zeno
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Recurrido

       v.                        CC-96-57        Certiorari

Oscar Soto González

    Acusado-Peticionario

Opinión Disidente del Juez Asociado señor Negrón García a la cual se une la Juez Asociada señora Naveira de Rodón

San Juan, Puerto Rico, a 7 de julio de 1999

I

Las tres (3) fotografías en colores del bello e inocente rostro de la niña R.J.N.P. –que unimos como anejos a esta ponencia protegiendo su identidad–, revelan elocuentemente y **más allá de duda razonable**, a través de las diminutas petequias en los tejidos alrededor de su boca, labios exteriores y labio inferior interior, la simetría del beso-succión delictivamente cometido por el apelante Dr. Oscar Soto González. **Nadie ha cuestionado la contemporaneidad y autenticidad de dichas fotografías, que hablan por sí solas.**

La propia definición que hace la mayoría al describir la etiología y evolución de las **petequias**

-"pequeñas erupciones cutáneas puntiformes debido a un **pequeño derrame sanguíneo superficial, inicialmente color rojo violáceo o rojo parduzo,** y van cambiando poco a poco hacia el verdoso, el amarillento, el pardusco, por sucesivos cambios químicos de la hemoglobina de la sangre derramada"- confirma sin ambages, la inmediatez y fidelidad de dichas fotografías a raíz del incidente ocurrido en la oficina del Dr. Soto González. Incuestionablemente, que los testimonios de la madre C.J.P.M. y del Dr. Bou Gautier -corroborados por las fotos aludidas- revelan las petequias en su etapa inicial: "color rojo violáceo o rojo parduzo".

II

A base de la prueba no contradicha, la siguiente sería la cronología de la génesis de las petequias de la niña R.J.N.P.

| | |
|---|---|
| 1:30 P.M. | Llegada Sra. C.J.P.M. con niña R.J.N.P. a la oficina del Dr. Soto González ubicada en el Condominio Las Torres, Bayamón |
| 1:45 P.M. | Entrevista inicial, ambas con el Dr. Soto González (15 minutos) |
| 2:30 P.M. | Análisis a **solas** niña R.J.N.P. con el Dr. Soto González (45 minutos) |
| 2:35 P.M. | Terminado análisis, conversa-ción final y pago servicios profesionales (5 minutos) |
| 2:50 P.M. | Salida y regreso oficina; ascensor y vestíbulo al notar Sra. C.J.P.M. petequias e informarle la niña R.J.N.P. que habían sido causadas por beso del Dr. Soto González (15 minutos) |
| 2:55 P.M. | Conversación Sra. C.J.P.M. con el Dr. Soto González inquiriendo sobre las marcas en los labios (5 minutos) |
| 3:00-3:10 P.M. | Llegada Sra. C.J.P.M. con niña al consultorio del pediatra Dr. Bou Gautier situado en Bayamón |
| 3:00-3:35 P.M. | Entrevista, examen y diagnós-tico Dr. Bou Gautier |
| 3:38 P.M. | Dr. Bou Gautier comienza escribir récord |
| 5:00 P.M. | Se toman las fotografías que revelan la condición observada y el diagnóstico del Dr. Bou Gautier |

III

Con todo respeto, la Sentencia mayoritaria se basa en una **duda irrazonable**. Descansa en la tesis de que la madre Sra. C.J.P.M., manipuló a su niña de cinco (5) años, y fraguó una conspiración para, sin ningún motivo aparente, inculpar al Dr. Soto González.

Semejante tesis implicaría que en quince (15) breves minutos –entre la oficina y el vestíbulo del edificio- ella le causó a su hija las petequias (o forzó se las auto- infligiera), en los labios mediante un beso succión descrito como "doloroso" por el perito de la defensa Dr. Pedro R. Jaunarena Pérez. De ser así, naturalmente la niña tenía que haber "con toda probabilidad" llorado y gritado según ese perito; circunstancia que no hubiese pasado inadvertida para los pacientes que estaban en la sala de espera de la oficina del Dr. Soto González al rápidamente regresar la Sra. C.J.P.M.

Bajo la misma tesis mayoritaria, –que no le da crédito al testimonio de la madre Sra. C.J.P.M.–, la otra probabilidad sería que ella le causó la lesión poco después, esto es, en el intervalo de los veinte (20) minutos transcurridos entre la salida de la oficina del Dr. Soto González y su llegada al consultorio del pediatra en el mismo Bayamón.

IV

No cabe esa ruta decisoria. Debimos confirmar el fallo de culpabilidad del Tribunal de Primera Instancia quien vio y aquilató **directamente** la prueba –avalado en la documentada Sentencia del Tribunal de Circuito de Apelaciones–. ¿Y cuál fue esa prueba?

Sucintamente, despojada de las diferencias usuales, no esenciales típicas de todo drama judicial, de manera no controvertida estableció que la niña R.J.N.P. estuvo a **solas** con el Dr. Soto González por aproximadamente cuarenta y cinco (45) minutos; que al salir, en el vestíbulo, la madre Sra. C.J.P.M. se percató de los puntitos rojos y luego de preguntarle, la niña le dijo que el Dr. Soto González la había besado. Optó por regresar a su oficina y allí le inquirió al Dr. Soto González si le había pasado algo en el área de la boca. Él nervioso, le preguntó a la niña si se había golpeado con una mesa o algo. La Sra.

C.J.P.M., no obstante su indignación, mantuvo la calma, no increpó al Dr. Soto González, pero decidió trasladarse rápidamente al consultorio en Bayamón del pediatra de la niña, Dr. Elías Bou Gautier. Éste luego de examinarla, dictaminó que las petequias existentes en los labios fueron producto de una succión o presión negativa, no auto infligidas. **Los exámenes físicos y las pruebas de laboratorio (sangre y otros análisis) confirmaron que la niña no padecía de ninguna condición de salud o enfermedad que pudiera causarlas.**

Aun así, la Sentencia mayoritaria enfatiza las siguientes **manifestaciones aisladas** para fundamentar su dictamen absolutorio. **Primero**, que la testigo de defensa, Sra. Aida Meléndez —que llevaba su hijo a la oficina del Dr. Soto González—, observó entre 30 y 60 segundos que la niña no tenía nada en su cara ni lloraba ni se quejaba. Nos preguntamos, sin conocimiento previo de sus características y rasgos faciales, ¿cómo podía afirmar que "no vio nada fuera de lo normal"? ¿realmente la observó bien? ¿Eran totalmente visibles las petequias en ese momento? ¿Se habían desarrollado y manifestado a plenitud? De haberse manifestado, en un rápido encuentro y saludo ¿tenían que ser percibibles? Nótese que ni la misma madre Sra. C.J.P.M. las notó originalmente a la salida del consultorio.

**Segundo**, que el Dr. Jaunarena Pérez opinó que la niña debió llorar o gritar "con toda probabilidad". ¿Y si, la niña como testificó, no lloró como era probable? ¿Por qué desmerecer su declaración, al no reaccionar de ese modo?

En otras palabras porque la niña perjudicada —contrario a "la probabilidad"—, no lloró ni gritó; porque dijo la verdad: que el beso no era como el que le dan sus padres y que su madre le había indicado que dijera que le habían apretado la boca; porque debieron ser "dos chupones o besos", no uno (1) como ella testificó, debemos descartar su inocente testimonio y sustituirlo por el de un experimentado perito Dr. Juanarena Pérez —si bien de vastas credenciales académicas y profesionales— como

todo ser humano, susceptible de equivocarse <u>bona</u> <u>fide</u>. **Un testimonio pericial no puede alterar la realidad extrajudicial**.

**Tercero**, los testigos de reputación. En cuanto a su impresionante despliegue, todos sabemos de su valor probatorio relativo. Valga recordar que no se juzgó al Dr. Soto González por sus ejecutorias sociales, grado de amistad, buena vecindad, creencias religiosas, logros profesionales, etc., sino por la debilidad que tuvo con la niña paciente R.J.N.P.

V

En casos de esta naturaleza, el proceso integral racional y reflexivo de formar conciencia judicial es arduo y complejo. Hemos estudiado la Exposición Narrativa de la Prueba y examinado acuciosamente las fotografías. **Estas últimas gozan de una garantía circunstancial especial de veracidad**. La precisión y claridad con que presentan a la vista las imágenes recogidas por el lente de la cámara es más elocuente que muchos testimonios verbales.

Esas fotografías perpetuaron de manera certera, eficiente y confiable ––más allá de la capacidad normal de los sentidos humanos–– la huella de la conducta delictiva del Dr. Soto González. **Su fidelidad y contemporaneidad reflejan** detalles suficientes: la forma de un beso succión, incluso los puntos de sangre de las petequias en su etapa inicial. Su valor intrínseco radica en la capacidad de perpetuar, objetivamente, múltiples detalles. Por su naturaleza tangible, las fotografías describen mejor que las palabras. Distinto al testimonio oral de un testigo, no son confusas ni descansan en una memoria pobre o falible.

Insistimos, nadie ha cuestionado la legitimidad de las fotografías. Éstas, unidas a la prueba testifical desfilada por el Ministerio Fiscal demuestran, más allá de duda razonable, la culpabilidad del Dr. Soto González.

Debimos confirmar.

ANTONIO S. NEGRÓN GARCÍA
Juez Asociado