| | | |
|---|---|---|
| ESTADO LIBRE ASOCIADO DE PUERTO RICO<br>TRIBUNAL DE APELACIONES<br>PANEL VI-ESPECIAL | | |
| ME SALVÉ, INC.<br><br>APELANTE<br><br>v.<br><br>GIB DEVELOPMENT, LLC<br><br>APELADO | KLAN202400521 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Civil Núm. BY2022CV03154<br><br>Sobre: Sentencia Declaratoria |

Panel integrado por su presidenta, la jueza Ortiz Flores, el juez Rivera Torres, la jueza Rivera Pérez y el juez Campos Pérez

Ortiz Flores, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 25 de noviembre de 2024.

Comparece ante nosotros Me Salvé, Inc. mediante el presente recurso de apelación y nos solicita que revoquemos la *Sentencia* emitida el 26 de abril de 2024, y notificada el 29 de abril de 2024, por el Tribunal de Primera Instancia, Sala Superior de Bayamón (TPI).

Adelantamos que, por los fundamentos que exponemos a continuación, se confirma el dictamen apelado.

**I**

Me Salvé Inc. (Me Salvé; apelante) presentó la *Demanda* de epígrafe, el 20 de junio de 2022, sobre Sentencia Declaratoria.[1] En síntesis, la apelante adujo que, el 2 de enero de 2007, suscribió un contrato de arrendamiento, sobre un inmueble dedicado a almacén y oficinas localizado en el Municipio de Cataño, con GIB Development, LLC (GIB; apelada), Me Salvé en calidad de arrendataria y GIB en calidad de arrendadora. Además, arguyó lo siguiente: que compartía el inmueble y los gastos comunes con Burger King, Inc.; que el canon de arrendamiento pactado para el área de las oficinas era de $280,000 anuales, pagaderos en mensualidades de $23,333.33 y el del área de almacén es de $1,150,000 anuales, pagaderos en mensualidades de $95,833.33; que,

---
[1] Apéndice del recurso, págs. 1-14.

luego de varias enmiendas, el contrato tenía una fecha de vencimiento hasta el 28 de febrero de 2043; que, el 5 de julio de 2018, el señor Nelson Menda en representación de Me Salvé y el señor Sender Shub, en representación de GIB, suscribieron una enmienda al contrato de arrendamiento que fue reducida a escrito y firmada en el *Agreement to Terminate Partnership* (Acuerdo de Separación); y, que dicho Acuerdo de Separación establecía que las partes acordaron que el arrendamiento de las oficinas y almacén continuarían por un término de cinco (5) años. El Acuerdo de Separación cobró vigencia y efectividad desde el 1 de julio de 2018 hasta el 31 de octubre de 2023.

Asimismo, Me Salvé alegó que, antes de que se subscribiera el Acuerdo de Separación que modificó las relaciones contractuales entre las partes, pagaba todos los gastos de mantenimiento de áreas comunes, seguridad, electricidad de áreas comunes, agua, recogido de basura, y mantenimiento de áreas verdes. Sin embargo, era después de fin de año y que GIB efectuaba una reconciliación de gastos operacionales comunes pagados contra los gastos que proporcionalmente le correspondían a Me Salvé.

La apelante sostiene que no se obligó a que los gastos operacionales comunes fueran pagados mensualmente. Añadió, además, que por más de catorce (14) años de relación contractual, nunca había pagado los gastos operacionales comunes a través de pagos mensuales a GIB; que desde la vigencia del contrato de arrendamiento, enero de 2007, había pagado la totalidad (el 100%) de los gastos operacionales comunes; que según el acuerdo entre las partes a Me Salvé le correspondía pagar el 71.73% de los gastos operacionales comunes y Burger King le correspondía pagar el 28.27%; que el uso y costumbre de los contratantes había sido desde el 2007 hasta el presente; que los gastos operacionales comunes eran reconciliados anualmente y su total pagado entre los meses de marzo y julio del año siguiente al año sobre el cual se hacía el cálculo. De este modo, Me Salvé apuntó que, luego de

transcurridos veintiséis (26) meses de la fecha de efectividad de la última enmienda al contrato, GIB pretendía enmendar unilateralmente el acuerdo alcanzado para compelerlo al pago mensual de los gastos operacionales comunes.

Por todo lo anterior, Me Salvé le solicitó al TPI que dictara una Sentencia Declaratoria que determine lo siguiente: el contrato de arrendamiento no regulaba los términos o plazos en los que debían pagarse los gastos operacionales comunes, según prorrateados; el contrato de arrendamiento no obligaba a Me Salvé a pagar mensualmente los gastos operacionales comunes; el uso y costumbre entre las partes contratantes, por los últimos catorce (14) años, había sido el pago global anual de los gastos operacionales comunes; el contrato de arrendamiento no le permitía a GIB enmendarlo unilateralmente; GIB incurrió en violación de contrato al enmendar unilateralmente el contrato de arrendamiento sin el consentimiento de Me Salvé; Me Salvé no había incurrido en evento alguno de incumplimiento del contrato de arrendamiento; el pago de los gastos operacionales comunes, una vez reconciliados y prorrateados al finalizar el año, eran exigibles anualmente al año siguiente al periodo operacional; le impusiera a GIB las costas, gastos y una cantidad razonable en honorarios de abogado; y que proveyera cualquier otro remedio que en derecho procediera.

Por su parte, GIB presentó su *Contestación a Demanda y Reconvención* el 14 de septiembre de 2022.[2] En esencia, negó algunas de las alegaciones presentadas en su contra y levantó sus defensas afirmativas. Alegó afirmativamente en su reconvención que, desde el 5 de julio de 2018 al presente, **Me Salvé nunca pagó los gastos operacionales mensualmente y adeudaba todos los meses de los gastos operacionales** desde enero de 2022, por los cuales adeudaba $64,980.45. También expresó que Me Salvé estaba en incumplimiento al

---

[2] Apéndice del recurso, págs. 75-119.

no pagar los gastos operacionales correspondientes al *Fire Pump System*, por el cual Me Salvé adeudaba a GIB la cantidad de $24,634.27. Así pues, GIB le solicitó al TPI que emitiera una Sentencia Declaratoria que determine lo siguiente: que Me Salvé tiene que pagar los gastos operacionales mensualmente; que ordene a Me Salvé a pagar los gastos operacionales adeudados por los meses de enero a la fecha de reconvención por la cantidad de $64,980.45 más todos los otros meses futuros que Me Salvé dejara de pagar y, de conformidad con el acápite J del Contrato de Arrendamiento, diera por terminado el arrendamiento; que ordene a Me Salvé el pago de $24,634.27 a GIB, correspondiente a los gastos operacionales del *Fire Pump System* y, de conformidad al acápite J del Contrato de Arrendamiento, diera por terminado el arrendamiento; que ordene el pago de intereses legales sobre las sumas reclamadas, pre y post sentencia; que ordene el pago de costas y honorarios de abogado a favor de GIB; y, que provea cualquier remedio que en derecho proceda.

El 30 de septiembre de 2022, Me Salvé ripostó con su *Contestación a Reconvención*.[3] Mediante esta negó las alegaciones esgrimidas en su contra y presentó sus defensas afirmativas. Luego de algunos trámites procesales, el 8 de septiembre de 2023, GIB presentó el *Informe de Conferencia con Antelación a Juicio*.[4] El TPI le ordenó que lo presentara en conjunto con Me Salvé.[5]

Así las cosas, el 11 de septiembre de 2023, Me Salvé presentó una *Solicitud de Desestimación por Academicidad y Falta de Justiciabilidad*.[6] En dicha solicitud, Me Salvé argumentó que un cambio en los eventos del caso lo tornaron académico. Expresó que, al contestar la *Demanda*, GIB admitió que el contrato de arrendamiento expiraba el 31 de octubre de 2023, y en vista de que dicho contrato no se renovó, Me Salvé desalojaría la propiedad. Por tanto, arguyó que las declaraciones judiciales que ambas

---

[3] Apéndice del recurso, págs. 124-133.
[4] Apéndice del recurso, págs. 159-171.
[5] Apéndice del recurso, pág. 172.
[6] Apéndice del recurso, págs. 173-185.

partes procuraban, sobre el momento del pago de los gastos operacionales comunes, no tendrían efecto práctico sobre las partes. Así pues, esgrimió que al terminarse el contrato de arrendamiento el 31 de octubre de 2023, ya no existía una controversia real entre las partes. Además, expuso que no tenía una obligación contractual en cuanto a las mejores hechas al reemplazo del *Fire Pump System*, por lo que la reclamación presentada por GIB en su *Reconvención* era totalmente improcedente. De este modo, Me Salvé le solicitó al TPI que convirtiera la Conferencia con Antelación al Juicio y Vista Transaccional en una vista argumentativa sobre la alegada academicidad del pleito.[7]

El 14 de septiembre de 2023, las partes presentaron en conjunto el *Informe de Conferencia con Antelación a Juicio*.[8] En lo pertinente al caso, Me Salvé anunció en el informe que sus testigos serían: Nelson Menda, dueño de Me Salvé y firmante, en representación de Me Salvé y del Acuerdo de Separación; Jim Taubenfeld, presidente de Me Salvé; y, Andrés García, contralor de Me Salvé. Por su parte, GIB presentó como sus testigos a Sender Shub, como dueño de GIB, y unos de los firmantes del Acuerdo de Separación; además, informó como testigos a María Carnero Collada, directora de la directora de operaciones y finanzas de GIB, y a Rosa Martínez, gerente de administración de propiedades en GIB.

El 18 de septiembre de 2023, se celebró la Vista sobre *Conferencia con Antelación a Juicio y Vista Transaccional*.[9] En la referida vista, la parte apelada expresó, entre otras cosas, que le había remitido una oferta de sentencia a la apelante, sin embargo, esta fue rechazada. Además, el TPI aprobó el *Informe de Conferencia con Antelación a Juicio* sometido por las partes. Cabe señalar que a esta vista solo compareció el Sr. Sender Shub en representación de GIB. Sin embargo, por parte de Me Salvé solo compareció su representación legal, es decir, no compareció ninguna

---

[7] Apéndice del recurso, págs.186-187. Dicha solicitud fue declara no ha lugar por el TPI. Véase Apéndice del recurso, pág. 189.
[8] Apéndice del recurso, págs. 190-223.
[9] Apéndice del recuro, págs. 230-236.

persona en representación de esta. Por tanto, el TPI reseñaló la vista de transacción por la incomparecencia de los representantes de Me Salvé.

Por su parte, el 2 de octubre de 2023, GIB presentó *su Oposición a "Solicitud de Desestimación por Academicidad y Falta de Jurisdicción".*[10] Sostuvo que la solicitud de desestimación presentada por Me Salvé era improcedente toda vez que se presentó tardíamente y en incumplimiento de las exigencias procesales aplicables y, además, por ser sustantivamente inadecuada por ignorar los reclamos pendientes presentados por GIB. En lo pertinente al caso que nos ocupa, argumentó lo siguiente: que Me Salvé conocía de la supuesta academicidad desde hace meses pero que esta esperó a pocos días de la *Conferencia con Antelación de Juicio* para levantar su reclamo; que la *Demanda* no era académica hasta tanto Me Salvé desalojara la propiedad y pagara los gastos operacionales del año 2023; que el Contrato de Arrendamiento suscrito entre GIB y Me Salvé constituía la ley entre las partes, el cual disponía que Me Salvé era responsable por las reparaciones menores, por lo que el reemplazo del *Fire Pump System* era una reparación menor; y, que Me Salvé tenía la obligación de cumplir con el Reglamento Núm. 7364 del Cuerpo de Bomberos de Puerto Rico y por el acápite G del Contrato de Arrendamiento.

Así las cosas, el 4 de octubre de 2023, el TPI emitió una *Resolución* mediante la cual determinó y dispuso, lo siguiente:

1. La controversia en torno a si los gastos operacionales [son exigibles] anualmente al año siguiente o de otra forma, **no advendrá académica sino hasta el 31 de octubre de 2023** cuando vence el contrato de arrendamiento o a la fecha en que ocurra efectivamente el desalojo del inmueble.

2. Aun cuando ocurra alguno de esos eventos, todas las demás controversias planteadas en el pleito -y particularmente en la reconvención- subsisten por alegarse allí el incumplimiento de contrato por parte de la demandante Me Salve, Inc.

---

[10] Apéndice del recurso, págs. 237-255.

Por lo anterior, resulta improcedente la desestimación solicitada.[11] (Énfasis nuestro.)

Posteriormente, el 31 de octubre de 2023, Me Salvé presentó una moción informativa donde reportó haber entregado las llaves y la posesión del inmueble objeto de la controversia a GIB.[12] Además, ese mismo día solicitó permiso para enmendar la demanda a los efectos conformar las alegaciones al estado procesal y sustantivo del caso, puesto que los asuntos tomaron un giro que incidía directamente con las alegaciones del caso de epígrafe.[13] Asimismo, el 6 de noviembre de 2023, Me Salvé notificó al TPI haberle enviado a GIB una oferta de transacción.[14]

Por otro lado, el 8 de noviembre de 2023, GIB presentó su *Oposición a "Solicitud de Permiso para Enmendar la Demanda" y Solicitud de Imposición de Sanciones por Temeridad*.[15] A través del aludido escrito, GIB sostuvo que había extendido una oferta transaccional, al amparo de la Regla 35.1 de Procedimiento Civil, *infra*, en la que se declararía ha lugar la *Demanda* original, por lo que hubiese puesto fin al pleito. No obstante, señaló que Me Salvé rechazó dicha oferta. Añadió, además, mediante la solicitud de enmienda, que Me Salvé buscaba incluir nuevas causas de acción, lo cual la hacía incompatible con el principio cardinal de perjuicio indebido. También, mencionó que Me Salvé había incumplido con varios trámites procesales del caso. Así pues, le solicitó al TPI que declarara no ha lugar la solicitud de enmienda y sancionara a Me Salvé y su representación legal por conducta temeraria y frívola.

El 9 de noviembre de 2023, Me Salvé presentó una *Urgente Solicitud de Desglose de Anejos y Alegaciones sobre las Negociaciones Transaccionales y Solicitud de Término*.[16] De este modo, sostuvo que las conversaciones transaccionales se llevaron a cabo bajo la protección que provee la Regla 408 de Evidencia, 32 LPRA App. VI, R. 408, por lo que

---

[11] Apéndice del recurso, pág. 257.
[12] Apéndice del recurso, págs. 258-260.
[13] Apéndice del recurso, págs. 261-264.
[14] Apéndice del recurso, pág. 340.
[15] Apéndice del recurso, págs. 342-405.
[16] Apéndice del recurso, págs. 406-409.

GIB no podía utilizarlas para apoyar sus contenciones. Asimismo, solicitó un término de diez (10) días para replicar los argumentos e imputaciones vertidas en la oposición de GIB sobre ME Salvé y sus abogados. Solicitó, además, que el TPI ordenara el desglose de los Anejos 1, 2 y 5 de la oposición y las alegaciones de la oposición que contienen referencias a las conversaciones transaccionales entre las partes, descritas en el párrafo 10 (i)-(iv) de esta moción, y no las admitiera.

También, el 9 de noviembre de 2023, notificada al siguiente día, el TPI emitió una *Resolución* a través de la cual declaró no ha lugar, por tardía, la solicitud de Me Salvé para enmendar la demanda, esto por ser presentadas luego de la conferencia con antelación al juicio.[17] Además, declaró no ha lugar las sanciones solicitadas por GIB. Igualmente, declaró no ha lugar la solicitud de término adicional para replicar.[18] De otro lado, el 10 de noviembre de 2023, se celebró una vista transaccional en la cual comparecieron los representantes de ambas partes.[19] No obstante, las partes no lograron acuerdo alguno.

Posteriormente, Me Salvé sometió una moción informativa donde le solicitó al TPI para que enmendara el Informe de Conferencia con Antelación al Juicio.[20] En específico, la *Sección VII – Prueba Documental y Material* de Me Salvé, para que contenga la descripción de las facturas y evidencia de pago de los gastos operacionales comunes que deben ser objeto de reconciliación por parte de GIB. Además, solicitó que se enmendara la *Sección VIII – Prueba Testifical* de Me Salvé para añadir a los señores Jorge Aldarondo y Diego Hernández del Banco Popular de Puerto Rico. Por su parte, GIB se expresó sobre dicha moción mediante la cual no objetó la mayoría de las identificaciones sometidas por Me Salvé, por ser necesarias para realizar la reconciliación.[21] Sin embargo, objetó la solicitud de enmienda en cuanto a la inclusión de los testigos

---

[17] Apéndice del recurso, págs. 410-411.
[18] Apéndice del recurso, pág. 412.
[19] Apéndice del recurso, págs. 413-416.
[20] Apéndice del recurso, págs. 417-431.
[21] Apéndice del recurso, págs. 793-853.

Jorge Aldarondo y Diego Hernández y se opuso a la autenticación de las identificaciones con la declaración jurada de Andrés García, bajo la Regla 902(k) de Evidencia. Además, solicitó que se eliminaran del récord todas las expresiones sobre otras materias por estas constituir prueba de referencia.

El 15 de diciembre de 2023, Me Salvé presentó una *Moción Informativa, Solicitud de Enmienda al Informe de Conferencia con Antelación al Juicio y Reiterando Academicidad.*[22] Sostuvo que las actuaciones de GIB durante el pleito reflejaban que los gastos operacionales comunes siempre fueron objeto de reconciliación anual. Por lo tanto, reiteró la academicidad de la reclamación de la *Demanda* puesto que el evento por el cual se solicitó sentencia declaratoria ocurrió tal cual fue alegado en esta. Asimismo, argumentó que la controversia sobre el *Fire Pump System* se circunscribía "a si [era] una inversión de capital cuyo remplazo está atado permanentemente al inmueble por operación del Código de Incendios de Puerto Rico." De este modo, señaló que, al ser una mejora estructural, el remplazo le correspondía a GIB como arrendador y dueño del inmueble.

El 19 de diciembre de 2023, el TPI emitió una *Resolución* en la cual determinó lo siguiente:

1. Se autorizan las enmiendas al Informe de conferencia con antelación al juicio solicitadas por la parte demandante, Me Salvé, para incluir las identificaciones 1-74 y 86-109, haciendo constar que la p[a]rte demandada no ha aceptado la autenticidad de tales documentos. A su vez, se autoriza la enmienda al *Informe* solicitada por la parte demandada para incluir los documentos y evidencia relacionada con la reconciliación, incluida en la tabla en la Sección IV(i) y presentada con la moción del 15 de diciembre de 2023, entrada 60 en el SUMAC.
2. Se provee no ha lugar a la solicitud de la parte demandante, Me Salvé, para enmendar el *Informe* a los fines de incluir a los testigos, Sr. Jorge Aldarondo y Sr. Diego Hernández. La solicitud es tardía.
3. Con relación a la declaración jurada del Sr. Andrés García, incluyendo los documentos a los que ésta se

---

[22] Apéndice del recurso, págs. 869-874.

refiere, y cuya inclusión tardía solicita la parte demandante, se pospone la determinación hasta el juicio, haciendo constar la objeción de la parte demandada.

4. El Tribunal apercibió a las partes que el descubrimiento de prueba finalizó y que no se autorizaría evidencia que no haya sido anunciada oportunamente. Así las cosas, no se autorizarán enmiendas sucesivas al Informe.[23]

Por su parte, el 20 de diciembre de 2023, GIB presentó el escrito titulado *Respuesta a "Moción Informativa … y Reiterando Academicidad.*[24] Al siguiente día, GIB presentó una *Moción sobre la Temeridad de Me Salvé* en la que le solicitó al TPI que condenara a Me Salvé al pago de los honorarios a favor de la primera por haber incurrido en una serie de actuaciones frívolas que fortalecen su pedido.[25] En resumen, GIB planteó que tuvo que incurrir en honorarios de abogados al responder a una carta de Regla 34 presentada fuera de término, realizar el informe de conferencia con antelación al juicio dos veces, oponerse a una moción de desestimación presentada tardíamente, oponerse a una tardía solicitud de enmienda de las alegaciones, responder a tardías solicitudes de enmiendas al informes de conferencia con antelación al juicio, oponerse una segunda moción de desestimación basada en los mismos argumentos previamente descartados por el TPI, participar de una conferencia con antelación al juicio y vista transaccional, participar de dos vistas transaccionales puesto que ningún representante de Me Salvé acudió a la conferencia con antelación al juicio y vista transaccional original, y atender argumentos frívolos.

Así las cosas, el 21 de diciembre de 2023, el TPI dictó una *Resolución* mediante la cual declaró no ha lugar la solicitud de Me Salvé donde reitera la academicidad.[26] Igualmente, proveyó no ha lugar sobre la controversia del *Fire Pump System*.

Más adelante, Me Salvé presentó una moción de reconsideración a los efectos de lo siguiente: que el TPI concluya que el proceso de cómputo

---

[23] Apéndice del recurso, págs. 866-867.
[24] Apéndice del recurso, págs. 869-874.
[25] Apéndice del recurso, págs. 875-883.
[26] Apéndice del recurso, págs. 884-885.

y reconciliación judicial es académico y que no es necesario el desfile de prueba para ello; y, que acepte las identificaciones Núm. 75-85 y 113-114 de Me Salvé y la declaración jurada del Sr. Andrés García.[27] Ante ello, el TPI dispuso lo siguiente:

1. Se autoriza enmendar el *Informe de conferencia con antelación al juicio* para incluir las identificaciones 113 y 114, consistentes de un correo electrónico entre los representantes de las partes y la reconciliación final preparada por GIB el 6 de diciembre de 2023.
2. Respecto a los demás asuntos, se reitera lo dispuesto en la Resolución emitida el 18 de diciembre de 2023, notificada el 19 de diciembre de 2023. Véase entrada 63 en SUMAC.[28]

El juicio en su fondo se celebró el 8 de enero de 2024.[29] Luego de aquilatada la prueba documental y testifical, el TPI dictó *Sentencia* el 26 de abril de 2024, notificada el 29 de abril de 2024.[30] Así pues, el TPI encontró probados los siguientes hechos:

1. Me Salvé es una corporación con fines de lucro creada e incorporada bajo las leyes del Estado Libre Asociado de Puerto Rico. Su dirección física es Me Salvé es 517 Carr. #5 Ste. 5, Cataño, Puerto Rico. La dirección postal de Me Salve es Box 2399, Toa Baja, Puerto Rico 00951- 2399. Hecho Estipulado 1 del Informe de Conferencia con Antelación a Juicio (Entrada 31 en SUMAC, pág. 16).
2. GIB Development, LLC es una corporación de responsabilidad limitada incorporada bajo las leyes del Estado Libre Asociado de Puerto Rico. Su dirección física es 580 Marginal Buchanan, Suite 3a, Guaynabo, Puerto Rico 00966. Su dirección postal es PO Box 3891, Guaynabo, Puerto Rico 00970. Hecho Estipulado 2 del Informe de Conferencia con Antelación a Juicio (Entrada 31 en SUMAC, pág. 16).
3. Nelson Menda es dueño de Me Salvé. Hecho Estipulado 3 del Informe de Conferencia con Antelación a Juicio (Entrada 31 en SUMAC, pág. 16).
4. Jim Taubenfeld es el presidente de Me Salvé. Hecho Estipulado 4 del Informe de Conferencia con Antelación a Juicio (Entrada 31 en SUMAC, pág. 16).
5. Sender Shub es el dueño y presidente de GIB. Hecho Estipulado 5 del Informe de Conferencia con Antelación a Juicio (Entrada 31 en SUMAC, pág. 16).
6. El 2 de enero de 2007, GIB y Me Salvé suscribieron un contrato de arrendamiento, mediante el cual GIB

---

[27] Apéndice del recurso, págs. 887-898.
[28] Apéndice del recurso, págs. 899-900.
[29] Apéndice del recurso, págs. 967-974.
[30] Apéndice del recurso, págs. 975-1003.

(Arrendadora) arrendó a Me Salvé (Arrendataria) unas oficinas y almacén (en adelante, "Contrato de Arrendamiento"). Hecho Estipulado 6 del Informe de Conferencia con Antelación a Juicio (Entrada 31 en SUMAC, pág. 16) y Exhibit 1 del juicio.

7. La Cláusula G del Contrato de Arrendamiento establece que "[l]a arrendataria cumplirá con todas las ordenanzas, leyes y reglamentos estatales y federales con relación al uso de la propiedad objeto de arrendamiento". Exhibit 1 del juicio.

8. La Cláusula H del Contrato de Arrendamiento establece que "[t]odas las reparaciones menores, así como el mantenimiento de la propiedad arrendada serán por cuenta y cargo de la Arrendataria. Sólo serán responsabilidad de la Arrendadora las reparaciones estructurales del edificio". Exhibit 1 del juicio.

9. El 1 de mayo de 2009, GIB – representado por Sender Shub - y Me Salvé – representado por Nelson Menda - suscribieron la Primera Enmienda Contrato de Arrendamiento. Este contrato fue jurado y suscrito ante la notaria Janet Díaz Salicrup en el affidávit número: 7,700, el 21 de mayo de 2009. Hecho Estipulado 7 del Informe de Conferencia con Antelación a Juicio (Entrada 31 en SUMAC, pág. 16).

10. El 13 de enero de 2017, GIB – representado por Sender Shub - y Me Salvé – representado por Nelson Menda - suscribieron la Segunda Enmienda al Contrato de Arrendamiento. Este contrato fue jurado y suscrito ante la notaria Janet Díaz Salicrup en el affidávit número 10,159 el 13 de enero de 2017. Hecho Estipulado 8 del Informe de Conferencia con Antelación a Juicio (Entrada 31 en SUMAC, pág. 16).

11. El 18 de abril de 2017, GIB – representado por Sender Shub - y Me Salvé – representado por Nelson Menda - suscribieron la Tercera Enmienda al Contrato de Arrendamiento. Hecho Estipulado 9 del Informe de Conferencia con Antelación a Juicio (Entrada 31 en SUMAC, pág. 16).

12. Nelson Menda y Sender Shub suscribieron un Agreement to Terminate Partnership con fecha de vigencia del 5 de julio de 2018 ("Acuerdo de Separación"). Hecho Estipulado 10 del Informe de Conferencia con Antelación a Juicio (Entrada 31 en SUMAC, pág. 16).

13. Como parte del Acuerdo de Separación, Nelson Menda adquirió la titularidad total de Me Salvé y Admincomp mientras que Sender Shub adquirió la de GIB. Hecho Estipulado 11 del Informe de Conferencia con Antelación a Juicio (Entrada 31 en SUMAC, pág. 16).

14. Desde el inicio del Contrato de Arrendamiento hasta el Acuerdo de Separación, Nelson Menda y Sender Shub eran los únicos dueños de Me Salvé y GIB en partes iguales. Hecho Estipulado 1 del Informe de Conferencia con Antelación a Juicio (Entrada 31 en SUMAC, pág. 17).

15. Hasta que entró en vigor el Acuerdo de Separación, Sender Shub era el presidente y representante autorizado de Me Salvé. Hecho Estipulado 13 del Informe de Conferencia con Antelación a Juicio (Entrada 31 en SUMAC, pág. 17).

16. Desde el inicio del Contrato de Arrendamiento hasta la firma del Acuerdo de Separación, Me Salvé pagaba los gastos operacionales anualmente. Hecho Estipulado 14 del Informe de Conferencia con Antelación a Juicio (Entrada 31 en SUMAC, pág. 17).

17. Esto cambió en virtud del Acuerdo de Separación. Específicamente, el acápite 11(b) refiere al Exhibit I-Pág. 1, el cual dispone que la renta mensual de la oficina central es de $23,333.33 y la del almacén es de $95,833.33 mensual. Respecto a los "passthrough expenses", el Exhibit I-Pág. 1 refiere al Exhibit I-Pág. 3, el cual dispone que a Me Salvé le toca el 71.73% de los gastos operacionales y a Burger King le corresponde el 28.27%. Hecho Estipulado 15 del Informe de Conferencia con Antelación a Juicio (Entrada 31 en SUMAC, pág. 17).

18. El Exhibit I-Pág. 1 identifica el "Fire Pump System/Main Gate Maintenance" como una de las partidas que sería costeada por la parte Arrendataria, en un porciento de 71.73%. Exhibit 8 del juicio.

19. Me Salvé también era responsable de otros gastos comunes, como el mantenimiento de la valla de seguridad, de la electricidad de las áreas comunes, del mantenimiento de las áreas verdes, entre otros. Exhibit 8 del juicio.

20. Me Salvé pagó los gastos operacionales correspondientes a los años 2018- 2022, salvo por el pago del fire pump system que GIB reclama en su reconvención. Hecho Estipulado 16 del Informe de Conferencia con Antelación a Juicio (Entrada 31 en SUMAC, pág. 17).

21. Me Salvé no ha pagado a GIB los gastos operacionales correspondientes al año 2023. Hecho Estipulado 17 del Informe de Conferencia con Antelación a Juicio (Entrada 31 en SUMAC, pág. 17).

22. El Contrato de Arrendamiento, según enmendado, culminó el 31 de octubre de 2023. Hecho Estipulado 18 del Informe de Conferencia con Antelación a Juicio (Entrada 31 en SUMAC, pág. 17).

23. El fire pump system entero está valorado en alrededor de $1,000,000.00 según surgió del testimonio de Sender Shub durante el juicio.

24. Para el año 2020, GIB se vio en la obligación de reemplazar un componente del fire pump system—la bomba—debido a que esta se dañó, por un costo total de $34,442.00. Exhibit 17 del juicio y testimonio de Sender Shub durante el juicio.

25. Este componente del sistema del fire pump system, mantiene presurizado el sistema de bombas. Véase testimonio de Sender Shub durante el juicio.

26. El componente que fue reemplazado es parte de un sistema de donde salen tubos al almacén objeto del Contrato de Arrendamiento. Véase testimonio de Sender Shub durante el juicio.

27. Sender Shub declaró que era la intención de las partes de que los gastos incurridos en el reemplazo del componente eran responsabilidad de Me Salvé.

28. Por parte de Me Salvé, Jim Taubenfeld, testificó que participó en el proceso de redacción del Exhibit 1, junto a Shub, y que el reemplazo del componente del fire pump system está fuera del alcance del mantenimiento a ser costeado por Me Salvé. Jim Taubenfeld admitió no ser firmante del Contrato de Arrendamiento.

29. GIB le reclamó a Me Salvé el pago de $24,634.27, correspondiente a su porciento aplicable por gastos operacionales, por el reemplazo de este componente. Véase testimonio de Sender Shub durante el juicio.

30. Me Salvé rehusó pagar esta cuantía, argumentando que no era un gasto operacional porque, según testificó Jim Taubenfeld, es un gasto estructural basado en que bajo los principios de finanzas es una inversión capital. Véanse testimonio de Jim Taubenfeld en juicio y testimonio de Sender Shub en juicio.

En consecuencia, el TPI declaró Ha Lugar la segunda y tercera causa de acción de la *Reconvención* presentada por GIB. Además, resolvió que Me Salvé incurrió en temeridad, por lo que le ordenó pagar la cantidad de $107,398.63 ($103,779.29 más interés legal aplicable desde que Me Salvé reconoció la deuda el 13 de diciembre de 2023) en concepto de gastos operacionales reconciliados para el 2023. Asimismo, le impuso a Me Salvé pagar a GIB la cantidad de $28,409.76 (la cuantía reclamada de $24,634.27 más la penalidad del interés legal).

Inconforme, Me Salvé acude ante este Tribunal de Apelaciones y nos señala la comisión de los siguientes errores:

**PRIMERO:** ERRÓ EL TPI AL CONCLUIR QUE LA OFERTA TRANSACCIONAL DE GIB ACTIVA AUTOMÁTICAMENTE LA IMPOSICIÓN DE HONORARIOS POR TEMERIDAD BAJO LA REGLA 35.1 DE [PROCEDIMIENTO CIVIL], PUES LA OFERTA INCUMPLIÓ CON LA NORMATIVA APLICABLE Y, ADEMÁS, NO DEBIÓ SER CONSIDERADA EN UNA ETAPA PRE-SENTENCIA PUES EL TPI SE BASÓ EN EVIDENCIA INADMISIBLE E HIZO UN ANÁLISIS QUE MEZCLÓ INCORRECTAMENTE LOS HONORARIOS BAJO LA REGLA 35.1 Y LA REGLA 44 DE [PROCEDIMIENTO CIVIL].

A. La oferta cursada [por] GIB no cumplió con los requisitos de la Regla 35.1 de [Procedimiento Civil] y la jurisprudencia interpretativa.

B. No procede la imposición de temeridad bajo la Regla 35.1 en la etapa pre-sentencia, pues el estatuto dispone que solamente será admisible en la etapa de memorando de costas y honorarios.

C. Erró el IPI al determinar que la Regla 35.1 opera de manera automática.

**SEGUNDO:** ERRÓ TPI AL CONCLUIR QUE ME SALVÉ ACTUÓ DE MANERA TEMERARIA BAJO LA REGLA 44 DE [PROCEDIMIENTO CIVIL] UTILIZANDO COMO PUNTO DE PARTIDA EL ALEGADO RECHAZO DE LA OFERTA CURSADA POR GIB Y ESTABLECIENDO COMO JUSTIFICACIÓN UNA LISTA DE EVENTOS PROCESALES POR LOS CUALES YA HABÍA DESCARTADO SANCIONAR A ME SALVE MEDIANTE RESOLUCIÓN QUE CONSTITUYE LEY DEL CASO Y QUE, EN LO ABSOLUTO, REPRESENTARON TEMERIDAD POR PARTE DE ME SALVÉ.

A. Me Salvé falló en su responsabilidad de presentar el Informe de Conferencia con Antelación al Juicio, lo que obligó a GIB a presentar su porción individualmente.

B. Me Salvé intentó alterar el cauce del caso, presentando una moción de desestimación el 11 de septiembre de 2023, a pesar de que el Tribunal había concedido hasta el 31 de julio de 2023 para presentar mociones dispositivas.

C. El Tribunal indicó que la Conferencia con Antelación al Juicio también era una Vista Transaccional, pero a la misma no compareció ningún representante de Me Salvé. Lo cual resultó en que se tuviera que recalendarizar una vista transaccional el 10 de noviembre de 2023.

D. El 31 de octubre de 2023, Me Salvé presentó una Solicitud de Permiso para Enmendar la Demanda para incluir nuevas causas de acción que no se relacionaban al pleito, a pesar de que el descubrimiento de prueba culminó el 30 de junio de 2023 y en [el] Informe de Conferencia con Antelación al Juicio no informó que enmendaría la Demanda.
Además, la enmienda propuesta procuraba añadir causas de acción que Me Salvé literalmente había instado el 23 de octubre de 2023 contra GIB en una Reconvención en el caso GIB Development, LLC v. Me Salvé, Inc., CT2023CV00094, Entrada 15 en SUMAC.

E. El 1 de diciembre de 2023, Me Salvé presentó en su Moción en Cumplimiento de Orden Anejando Exhibits [e] Identificaciones de la Parte Demandante a SUMAC (Entrada 52 en SUMAC).

Me Salvé, sin previa autorización del Tribunal, intentó introducir una [d]eclaración jurada de Andrés García que testificaba en los méritos del caso, mientras representó que era para autenticar un récord de negocio bajo la Regla 902 (k) de Evidencia.

F. Moción Informativa y Solicitud de Enmienda a las Secciones Vil y VIII del Informe de Conferencia con Antelación al Juicio, pretendiendo añadir dos nuevos testigos al juicio, a pesar de haber sido conocidos por esta con suficiente antelación al Informe [...] y no haber sido identificados en el mismo y, de manera tardía, introducir como evidencia una declaración jurada de Andrés García que no había sido previamente notificada, bajo fundamentos improcedentes.

G. El 15 de diciembre de 2023, Me Salvé presentó una Moción Informativa, Solicitud de Enmienda al Informe de Conferencia con Antelación al Juicio y Reiterando Academicidad (Entrada 61 en SUMAC). Me Salvé reiteró los argumentos de desestimación que habían sido expresamente rechazados por este Tribunal mediante Resolución de[l] 3 de octubre de 2023 (Entrada 39 en SUMAC), y sobre los cuales Me Salvé no recurrió de nuestra Resolución al Tribunal de Apelaciones.

**TERCERO:** ERRÓ EL TPI AL CONCLUIR QUE BAJO LA CLÁUSULA (G) DEL CONTRATO DE ARRENDAMIENTO, PROCEDÍA IMPONERLE RESPONSABILIDAD A ME SALVÉ POR EL DESMANTELAMIENTO E INSTALACIÓN DEL *FIRE PUMP SYSTEM* ESTO A PESAR DE QUE EL *FIRE PUMP SYSTEM* ES UN SISTEMA ADOSADO AL EDIFICIO.

A. El *fire pump system* es un elemento estructural adosado a la propiedad.

B. El uso de un inmueble no tiene relación alguna con la obligación pecunaria sobre el reemplazo de elementos estructurales y estacionarios que en este se realicen.

C. De todas las disposiciones importantes y aplicables del *Código de Seguridad Humana*, la Sentencia se limita a una sola sección que cita, además, de manera incompleta.

**CUARTO:** ERRÓ EL TPI AL CONCLUIR QUE BAJO LA CLÁUSULA H DEL CONTRATO DE ARRENDAMIENTO, PROCEDÍA IMPONERLE RESPONSABILIDAD A ME SALVÉ POR EL DESMANTELAMIENTO E INSTALACIÓN DE DICHO SISTEMA ESTO A PESAR DE QUE EL *FIRE PUMP SYSTEM* ES UN SISTEMA ADOSADO AL EDIFICIO.

A. El TPI citó artículos del Código Civil que son claramente inaplicables a la controversia sobre el

pago de mejoras estructurales en un contrato de arrendamiento.

B. El TPI citó de manera aislada definiciones de la Real Academia Española.

C. El TPI hizo referencias a Reglamentos de la Junta de Planificación que son claramente inaplicables a la controversia sobre el pago de mejoras estructurales en el contexto de un contrato de arrendamiento.

   i. El Reglamento Núm. 9473 de la Junta de Planificación.
   ii. El Reglamento Núm. 9233 de la Junta de Planificación.

D. El TPI citó jurisprudencia que es igualmente inaplicable a la controversia sobre el pago del *fire pump system*.

E. El TPI hizo una interpretación errónea del contrato de arrendamiento suscrito entre Me Salvé y GIB y del derecho aplicable a este tipo de acuerdo contractual.

F. No procede la imposición de interés legal sobre la partida del *fire pump system*.

**QUINTO:** ERRÓ EL TPI AL DETERMINAR QUE ME SALVÉ SENTÓ EN SU TURNO DE PRUEBA A LA DIRECTORA DE OPERACIONES Y FINANZAS DE GIB "EN SU CARÁCTER PERSONAL" CUANDO ELLA: FUE ANUNCIADA POR GIB COMO TESTIGO DE CARGO PARA SUS DEFENSAS Y ALEGACIONES Y TODO EL INTERROGATORIO DE ME SALVÉ FUE DIRIGIDO A SUS FUNCIONES PROFESIONALES Y REPRESENTATIVAS.

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II**

**A.**

Los tribunales apelativos actuamos, esencialmente, como foros revisores. "Nuestra tarea principal es examinar cómo los tribunales inferiores aplican el derecho a los hechos particulares de cada caso." *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013). Por lo tanto, **un tribunal apelativo no debe intervenir con la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos de los tribunales de primera instancia**.

La Regla 42.2 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 42.2, expresamente dispone que las determinaciones de hechos del foro

apelado, sobre todo, las que se fundamentan en testimonio oral, se respetarán por el tribunal apelativo, a menos que sean claramente erróneas. Esta deferencia hacia el foro primario responde al hecho de que el juez sentenciador es el que tiene la oportunidad de recibir y apreciar toda la prueba oral presentada, de escuchar la declaración de los testigos y evaluar su *demeanor* y confiabilidad.

Los tribunales revisores no celebramos juicios plenarios, ni presenciamos el testimonio oral de los testigos, ni dirimimos credibilidad y tampoco hacemos determinaciones de hechos. Esa tarea le compete al foro apelado o recurrido. *Dávila Nieves v. Meléndez Marín, supra*, a la pág. 770. A partir de los hechos, los tribunales de instancia precisan las controversias, elaboran sus conclusiones de derecho y resuelven el caso. *Id.* Claro está, como foro apelativo podemos intervenir con la apreciación de la prueba oral que haga el tribunal primario, cuando este actúe con pasión, prejuicio o parcialidad, o incurra en un error manifiesto al aquilatarla. *Meléndez v. Caribbean Int'l News*, 151 DPR 649, 664 (2000). También se nos permite intervenir cuando esa apreciación se distancia de la realidad fáctica o esta es inherentemente imposible o increíble. *Pueblo v. Soto González*, 149 DPR 30, 37 (1999). Sobre este extremo, el arbitrio del juzgador de hechos es respetable, mas no es absoluto. Una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de un tribunal apelativo. *Vda. de Morales v. De Jesús Toro*, 107 DPR 826, 829 (1978).

En síntesis, el tribunal apelativo respetará y sostendrá la apreciación de la prueba oral que realiza el tribunal sentenciador, excepto en los casos de error manifiesto en el desempeño de esa función, cuando el examen detenido de toda la prueba convenza al foro revisor de que el juzgador descartó injustificadamente elementos probatorios importantes o que fundamentó su criterio únicamente en testimonios de escaso valor, o inherentemente improbables o increíbles. *Dávila Nieves v. Meléndez Marín, supra*, a las págs. 771-772.

**B.**

El Artículo 1042 del Código Civil de 1930,[31] hoy derogado, atendía lo relativo a las fuentes de obligaciones. En lo pertinente, la citada disposición legal establecía que las obligaciones nacían, y nacen "de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitos en que intervenga cualquier género de culpa o negligencia." 31 LPRA sec. 2992.[32] Asimismo, el Artículo 1044 disponía que, "[l]as obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes". 31 LPRA sec. 2994. En armonía con lo anterior, el principio de *pacta sunt servanda* establece la obligatoriedad del contrato según sus términos y las consecuencias necesarias derivadas.. de la buena fe. *BPPR v. Sucn. Talavera*, 174 DPR 686, 693 (2008).

Por otro lado, el Código Civil de 1930, disponía en su Artículo 1206, que "[e]l contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio." 31 LPRA sec. 3371. A su vez, un contrato se concretiza cuando concurren los siguientes requisitos: consentimiento de los contratantes; el objeto cierto; y la causa de la obligación. Artículo 1213 del Código Civil de 1930, 31 LPRA sec. 3391. En todo caso, "[l]os contratos se perfeccionan por el mero consentimiento, y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley." Artículo 1210 del Código Civil de 1930, 31 LPRA sec. 3375.

En nuestro ordenamiento jurídico rige el principio de la autonomía de la voluntad el cual le concede amplia libertad de acción a las partes que desean obligarse. *BPPR v. Sucn. Talavera*, *supra*, a la pág. 693. La aludida norma está recogida por el Artículo 1207 del Código Civil de 1930,

---

[31] El Código Civil de 1930 fue derogado por Ley Núm. 55 del 1 de junio de 2020, 31 LPRA sec. 5311 *et seq.*, vigente desde el 28 de noviembre de 2020. No obstante, a los hechos del presente caso le es aplicable el ordenamiento jurídico anterior. Véase, Artículo 1812 del Código Civil de 2020, 31 LPRA sec. 11717.

[32] Análogo al Artículo 1063 del Código Civil de 2020, 31 LPRA sec. 8984.

el cual disponía de la siguiente forma: "Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público." 31 LLPRA sec. 3372; *Álvarez v. Rivera*, 165 DPR 1, 17 (2005), que cita a *S.L.G. Irizarry v. S.L.G. García*, 155 DPR 713, 724 (2001). Asimismo, siempre y cuando concurran las condiciones esenciales para su validez, los contratos podrán celebrarse de cualquier forma, incluso, verbalmente. Artículo 1230 del Código Civil de 1930, 31 LPRA sec. 3451; *Velco v. Industrial Serv. Apparel*, 143 DPR 243, 250 (1997).

Estas normas reconocen un doble postulado en la teoría general de los contratos. Por un lado, la libertad de contratación, y del otro, la total autonomía de la voluntad de los contratantes que han escogido obligarse mutuamente para determinar el contenido de dicha relación jurídica. Dicha autonomía está limitada únicamente por los parámetros que impongan la ley, la moral social y el orden público. De tal forma, una vez los contratantes eligen pactar entre sí, estos pueden establecer el contenido y alcance normativo de su relación jurídica, sin otra intromisión del Estado que la impuesta por los criterios antes mencionados. Por lo tanto, los tribunales de justicia no pueden relevar a una parte de cumplir con lo que se obligó a hacer mediante un contrato, cuando el mismo es legal y válido. Véase, *De Jesús González v. A.C.*, 148 DPR 255, 271 (1999), que cita a *Cervecería Corona v. Commonwealth Ins. Co.*, 115 DPR 345 (1984); *Olazábal v. U.S. Fidelity, etc.*, 103 DPR 448, 462 (1975).

**C.**

El Art. 1206 del Código Civil de Puerto Rico de 1930 (Código Civil), 31 L.P.R.A. sec. 3371, establece que el contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio.

De los términos y condiciones de un contrato se derivan las obligaciones de las partes, las cuales tienen fuerza de ley entre éstas y deben cumplirse a tenor de estos. Art. 1044 del Código Civil, 31 L.P.R.A.

sec. 2994; *Cervecería Corona Inc. v. Commonwealth Ins. Co.*, *supra.* Los contratos se perfeccionan con el mero consentimiento y desde ese momento cada una de las partes viene obligada a su cumplimiento, así como acatar las consecuencias que se deriven de los mismos, conforme a la buena fe, al uso, a la ley y a las buenas costumbres. *Unisys v. Ramallo Brothers*, 128 DPR 842, 852 (1991); *Ramírez v. Club Cala de Palmas*, 123 DPR 339 (1990).

El Artículo 1207 del Código Civil dispone que "[l]os contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público." 31 L.P.R.A. sec. 3372. Véase: *Abengoa, S.A. v. American Intl. Ins.,* 176 DPR 512, 519 (2009); *De Jesús González v. A.C.*, *supra*, pág. 263.

El contrato de arrendamiento es aquel contrato mediante el cual la persona denominada *arrendador* se obliga a ceder el uso o goce de una cosa a la persona denominada *arrendataria* por un tiempo determinado y a precio cierto. Artículos 1433 y 1436 del Código Civil, 31 LPRA secs. 4012 y 4031. Este contrato es uno de carácter consensual, bilateral y oneroso. J. Vélez Torres, *Curso de Derecho Civil: Derecho de Contratos*, San Juan, Ed. Universidad de Interamericana de Puerto Rico, Facultad de Derecho, T. IV, V. II, págs. 267-268.

Por su lado, el Artículo 1444 de Código Civil, 31 LPRA sec. 4051, establece cuales son las obligaciones del arrendador. En específico, establece que el arrendador estará obligado a lo siguiente:

(1) A entregar al arrendatario la cosa objeto del contrato.

(2) A hacer en ella durante el arrendamiento todas las reparaciones necesarias a fin de conservarla en estado de servir para el uso a que ha sido destinada.

(3) A mantener al arrendatario en el goce pacífico del arrendamiento por todo el tiempo del contrato.

(4) A suscribir y entregar al arrendatario un recibo por cada pago hecho por éste.

Referente a las reparaciones necesarias, el Tribunal Supremo ha reconocido que, en ausencia de pacto en lo contrario, el arrendador queda obligado a realizar estas reparaciones para mantener la cosa objeto del arrendamiento en estado para que sirva para el uso al cual ha sido destinado en su contrato. *Maldonado v. Interamerican University*, 104 DPR 420, 425 (1975). Se consideran reparaciones necesarias aquellas que subsanan aquellos deterioros producidos por su uso y pérdidas ocasionadas por caso fortuito ocurridos a la cosa arrendada. *Castro Anguita v. Figueroa*, 103 DPR 844, 852-853 (1975).

El Artículo 1445 de Código Civil, 31 LPRA sec. 4052, establece cuales son las obligaciones del arrendatario. Respecto a las mismas establece que el arrendatario queda obligado a lo siguiente:

(1) A pagar el precio del arrendamiento en los términos convenidos.

(2) A usar de la cosa arrendada como un diligente padre de familia, destinándola al uso pactado; y en defecto de pacto, al que se infiera de la naturaleza de la cosa arrendada según la costumbre de la tierra.

(3) A pagar los gastos que ocasione la escritura del contrato.

De haber incumplimiento por parte del arrendador o arrendatario con sus obligaciones según establecida en la ley, la parte afectada podrá optar en rescindir el contrato de arrendamiento y solicitar una indemnización en daños y perjuicios. Artículo 1446 de Código Civil, 31 LPRA sec. 4053. No empecé a lo anterior, la parte afectada podrá solicitar solamente la indemnización en daños y perjuicios, dejando subsistente el contrato de arrendamiento. *Id.*

El contrato de arrendamiento puede darse sobre cualquier bien presente o futuro. Artículo 1339 del Código Civil, 31 LPRA sec. 10131. En lo pertinente, en este tipo de contratos una parte se obliga a ceder a otra el uso y disfrute de un bien particular a cambio de un precio cierto. Artículo 1331 del Código Civil, 31 LPRA sec. 10101. A tales efectos, el arrendador es quien se obliga a ceder el uso de la cosa y el arrendatario es quien

adquiere el uso de la cosa arrendada y por la cual se obliga a pagar. Artículos 1345-1346 del Código Civil, 31 LPRA secs. 10161-10162.

Mediante el contrato de arrendamiento el arrendatario está obligado a pagar el precio del arrendamiento bajo los términos convenidos. Artículo 1346 del Código Civil, 31 LPRA sec. 10162. Por consiguiente, si el arrendatario incumple con el pago convenido en el contrato de arrendamiento, el arrendador tendrá a su disposición la acción de desahucio. Artículo 621 del Código de Enjuiciamiento Civil de Puerto Rico de 1933, 31 LPRA sec. 2822. Asimismo, entre las obligaciones de un arrendatario, dispone el Código Civil que este debe "desalojar o restituir arrendado, una vez termina el arrendamiento". 31 LPRA sec. 10162.

**D.**

Una oferta de sentencia es una propuesta por escrito realizada por la parte demandada o aquella parte contra quien se reclama, en donde esta se allana a que el Tribunal dicte sentencia en su contra por los términos que se encuentran en su oferta. R. Hernández Colón, *Práctica Jurídica de Puerto Rico Derecho Procesal Civil*, 6ta ed. rev., Ed. LexisNexis Puerto Rico, 2017, pág. 406. En nuestro ordenamiento jurídico la oferta de sentencia se encuentra regulada por la Regla 35.1 de Procedimiento Civil de Puerto Rico (Procedimiento Civil), 32 LPRA Ap. V. R 35.1. En especificó la regla establece lo siguiente:

> En cualquier momento antes de los veinte (20) días precedentes al comienzo del juicio, la parte que se defiende de una reclamación podrá notificar a la parte adversa una oferta para consentir a que se dicte sentencia en su contra por la cantidad o por la propiedad o en el sentido especificado en su oferta, con las costas devengadas hasta ese momento. La oferta deberá cumplir con los requisitos siguientes:
>
> (1) Hacerse por escrito, notificando a la parte a quien se le hace mediante correo certificado.
>
> (2) Especificar quién hace la oferta y la parte a la que va dirigida.
>
> (3) Establecer la cantidad, si alguna, que se ofrece por concepto de daños.

(4) Especificar la cantidad total o propiedad y condiciones ofrecidas.

(5) Establecer la cantidad por concepto de costas devengadas hasta el momento.

Si dentro de los diez (10) días siguientes a la notificación la parte adversa notifica por escrito que acepta la oferta, cualquiera de las partes podrá presentarla junto con la notificación de su aceptación y la prueba de su notificación, y entonces el Secretario o Secretaria del tribunal dictará sentencia. Si no es así aceptada, será considerada como retirada y no será admisible en evidencia, excepto en un procedimiento para determinar costas, gastos y honorarios de abogado o en un procedimiento para obligar al cumplimiento de una sentencia dictada, producto de una oferta de sentencia.

En todo caso en que la sentencia que obtenga finalmente la parte a quien se le hizo la oferta sea igual o menos favorable, ésta tendrá que pagar las costas, los gastos y los honorarios de abogado incurridos con posterioridad a la oferta.

El hecho de que se haga una oferta y ésta no se acepte no impide que se haga otra subsiguiente. Cuando la responsabilidad de una parte haya sido adjudicada mediante sentencia pero queda aún por resolverse en procedimientos ulteriores la cuantía de los daños o la extensión de dicha responsabilidad, la parte cuya responsabilidad se haya adjudicado podrá notificar una oferta de sentencia y ésta tendrá el mismo efecto que una oferta hecha antes del juicio si se notifica dentro de un término razonable no menor de veinte (20) días antes del comienzo de la vista.

En referencia a la imposición de las costas, los gastos y los honorarios de abogados a la parte que no aceptó una oferta de sentencia y luego obtiene una sentencia igual o menos favorable que la oferta cursada, el Tribunal Supremo ha expresado que para que surta efecto esta imposición, la oferta de sentencia debió haber sido una realista, razonable y producto de buena fe. *Morrell et al. v. Ojeda et al.*, 151 DPR 864, 875 (2000) citando a *H.U.C.E. de Ame v. V. & E. Eng. Const.*, 115 DPR 711, 716 (1984). De igual forma, nuestro más alto foro ha expresado que esta imposición no opera de manera automática, sobre esto expresó:

De otra parte, somos del criterio que no debemos establecer una norma que "obligue" a una parte demandante a aceptar una oferta que honesta y realmente ésta considera irrazonable o irrisoria so pena de castigarlo por ello mediante la imposición de lo que podría resultar cuantiosos honorarios de abogado. Ello resulta totalmente contrario a la sabia y justa norma que este Tribunal estableciera en *H.U.C.E. de Ame. v. V & E Eng. Const.*, ante —a los efectos de que la referida Regla 35.1 resulta inoperante cuando la oferta es

irrazonable o irrisoria— ya que dicha norma, al concederle facultad o discreción al tribunal para determinar cuando una oferta adolece de esa característica, precisamente parte de la premisa de que la imposición de honorarios de abogado, bajo la Regla 35.1, ante, *no* es automática *ni* mandatoria.

A tenor con lo antes expresado, y en vista de nuestra obligación de "mantener abiertos" los tribunales a aquellos litigantes de buena fe, resolvemos que la citada Regla 35.1 de Procedimiento Civil, no opera de manera automática en la situación prevista en la misma; requiriéndose, por el contrario, para la imposición de honorarios de abogado a la parte demandante que rechazó una oferta de transacción "más favorable" que la sentencia finalmente obtenida por ella en el caso, una previa determinación de temeridad o arbitrariedad en dicha actuación por parte del tribunal de instancia. *Morrell et al. v. Ojeda et al.*, 151 DPR págs. 881-882.

Por ende, en nuestro ordenamiento jurídico la imposición de honorarios de abogados no operará de manera automática bajo la Regla 35.1 de Procedimiento Civil, *supra*, sin que antes el tribunal emita una determinación de temeridad o arbitrariedad. Por su parte, se expresó que la razonabilidad, veracidad y la buena fe de oferta cursada será determinada por el tribunal tomando en consideración los siguientes factores:

[…]los tribunales deberán tomar en cuenta diversos factores a la luz de las circunstancias particulares del caso. Entre éstos, consideramos de vital importancia los siguientes:

(1) la cuantía ofrecida,

(2) los términos de la oferta,

(3) la controversia planteada

y (4) la etapa de los procedimientos al momento en que se realiza la oferta.
*Morrell et al. v. Ojeda et al.*, 151 DPR pág. 882.

**E.**

La Regla 44.1 de Procedimiento Civil, 32 LPRA Ap. III, R. 44.1, permite la imposición de honorarios en caso de que cualquiera de las partes, o su abogado, procedan con temeridad o frivolidad. En su parte pertinente, el inciso (d) de la mencionada norma establece lo siguiente: "En caso [de] que cualquier parte o su abogado o abogada haya procedido

con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta." 32 LPRA Ap. V, R. 44.1 (d).

Se considera temeridad "aquella conducta que hace necesario un pleito que se pudo evitar, que lo prolonga innecesariamente o que obliga que la otra parte incurra en gestiones evitables." *Marrero Rosado v. Marrero Rosado*, 178 DPR 476, 504 (2010). Cabe señalar que esta misma conducta se toma en cuenta tanto para la imposición de honorarios de abogado al amparo de la Regla 44.1 (d) de Procedimiento Civil, *supra*, como para la imposición del interés legal por temeridad al amparo de la Regla 44.3 (b) de Procedimiento Civil, 32 LPRA Ap. V, R. 44.3 (b). Según lo ha expresado el Tribunal Supremo, ambas penalidades "persiguen el mismo propósito de disuadir la litigación frívola y fomentar las transacciones mediante sanciones que compensen a la parte victoriosa los perjuicios económicos y las molestias producto de la temeridad de la otra parte." *Marrero Rosado v. Marrero Rosado*, *supra*, pág. 505.

El propósito de la imposición de honorarios por temeridad es penalizar a la parte perdidosa "que[,] por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito." *Rivera v. Tiendas Pitusa, Inc.*, 148 DPR 695, 702 (1999). Se considera que incurre en temeridad aquella parte que torna necesario un pleito frívolo y obliga a la otra a incurrir en gastos innecesarios. *P.R. Oil v. Dayco*, 164 DPR 486, 511 (2005). La determinación de si una parte obró con temeridad descansa en la sana discreción del tribunal sentenciador. *Id.* La imposición del pago de honorarios de abogado es imperativa cuando el tribunal sentenciador concluye que una parte incurrió en temeridad. *Id.* Además, debemos señalar que la norma es que "[e]n ausencia de una conclusión expresa a tales efectos, un pronunciamiento en la sentencia condenando al pago de

honorarios de abogado, implica que el tribunal sentenciador consideró temeraria a la parte así condenada." *Montañez Cruz v. Metropolitan Cons. Corp.*, 87 DPR 38, 40(1962). Es decir, no es necesaria una determinación expresa de temeridad si el foro sentenciador impuso el pago de una suma por honorarios de abogado en su sentencia. Por constituir un asunto discrecional del tribunal sentenciador, los tribunales revisores solo intervendremos en dicha determinación cuando surja que un claro abuso de discreción. *P.R. Oil v. Dayco*, *supra*, pág. 511.

Sin embargo, es importante aclarar que se entiende que no existe temeridad cuando lo que se plantea ante el foro primario son planteamientos complejos y novedosos que no han sido resueltos en nuestra jurisdicción. De igual manera, no existe temeridad en aquellos casos en que el litigante actúa de acuerdo con la apreciación errónea de una cuestión de derecho y no hay precedentes establecidos sobre la cuestión. Tampoco se incurre en temeridad cuando existe alguna desavenencia honesta en cuanto a quién favorece el derecho aplicable a los hechos del caso. *Santiago v. Sup. Grande*, 166 DPR 796, 821 (2006).

**III**

ME SALVÉ señaló en su recurso ante nuestra consideración, que el TPI erró como sigue: (1) al concluir que la oferta de transacción de GIB activa la imposición de honorarios por temeridad bajo la Regla 35.1 de Procedimiento Civil, porque incumplió la norma aplicable y no debió ser considerada en la etapa de pre-sentencia, por estar fundada en evidencia inadmisible y un análisis incorrecto del foro apelado; (2) al concluir que Me Salvé fue temeraria en contravención a lo dispuesto en la Regla 44 de Procedimiento Civil por haber rechazado la oferta cursada por GIB conforme a una lista de eventos procesales por los cuales ya había descartado sancionar a ME SALVÉ y que no representaron temeridad; (3) al concluir que bajo la cláusula G del contrato de arrendamiento, procedía imponerle responsabilidad a ME SALVÉ por el desmantelamiento e instalación del *fire pump system*, a pesar de que ese sistema está adosado

al edificio, objeto del contrato en controversia; (4) al concluir que bajo la cláusula H del contrato de arrendamiento, procedía imponerle responsabilidad a ME SALVÉ por el desmantelamiento e instalación del *fire pump system*, a pesar de que ese sistema está adosado al edificio, objeto del contrato en controversia; y, (5) al determinar que ME SALVÉ sentó en su turno de prueba a la directora de operaciones y finanzas de GIB "en su carácter personal" cuando ella fue anunciada por la parte apelada como testigo de cargo para sus defensas y alegaciones y todo el interrogatorio de la parte apelante fue dirigido a sus funciones profesionales y representativa. La parte apelante no tiene razón.

El TPI declaró, en la sentencia apelada, **ha lugar la segunda y tercera causa de acción de la reconvención de GIB** y adjudicó lo siguiente:

> Se resuelve, además, que Me Salvé incurrió en temeridad. En consecuencia, se condena a Me Salvé a pagar a GIB la cantidad de $107,398.63 ($107,779.29 más el interés legal aplicable desde que Me Salvé reconoció la deuda el 13 de diciembre de 2023) en concepto de gastos operacionales reconciliados para el 2023. Además, se impone a Me Salvé pagar a GIB la cantidad de $28,409.76 (la cuantía reclamada de $24,634,27 más la penalidad del interés legal).

> Se ordena a GIB que dentro de un término de diez (10) días de la notificación de esta Sentencia, que presente un Memorando de Costas y Honorarios de Abogados, en el cual identificaría las costas incurridas en este caso, para ser reembolsadas al amparo de la Regla 44.1 de Procedimiento Civil. En cuanto a los honorarios a ser reembolsados por Me Salvé, GIB deberá someter, bajo juramento la cuantía facturada en cada mes desde abril de 2023 y un resumen del trabajo realizado en cada mes desde el abril de 2023 hasta el presente, de modo que este Tribunal pueda determinar la cuantía a ser reembolsada por Me Salvé.

> Las sumas concedidas en virtud de la segunda y tercera causa de acción de la Reconvención, así como las costas y honorarios, se deberán ajustar para incluir el interés legal acumulado entre la fecha de esta Sentencia y el día en que Me Salvé satisfaga dichas cuantías, de conformidad con la Regla 44.3(a) de Procedimiento Civil. El interés aplicable a sentencias no gubernamentales es de 9.50% para el período de 1 de enero de 2024 al 30 de junio de 2024.

> En cuanto a la **Demanda y la primera causa de acción de la Reconvención** que conciernen a si el pago por los gastos operacionales era mensual o anual, **se declaran**

**académicas**, por las razones estipuladas entre las partes. (Énfasis en original.)[33]

Luego de examinar la Transcripción de la Prueba, los escritos de ambas partes, y la sentencia apelada, resolvemos que no se cometieron los errores señalados. El foro sentenciador merece nuestra deferencia en su adjudicación de credibilidad sobre la prueba presentada y su dictamen fundamentado en el derecho aplicable discutido previamente, por lo que se confirma el dictamen apelado.

**IV**

Por lo antes expuesto, se confirma la *Sentencia* apelada.

**Notifíquese.**

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[33] Apéndice del recurso, págs. 975-1003.